No. 19,290.

F. L. KIRBY, *Appellee*, v. THE UNION PACIFIC RAILROAD COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

1. RAILROADS—*Negligence—For Determination of Jury.* The rule followed that disputed facts tending to show negligence are properly for the consideration of the jury.

2. SAME—*Interstate Shipment—Change of Destination—Interstate Commerce.* A carload of goods and live stock consigned from a point in Oklahoma to a point in Kansas, but final destination altered en route, is a shipment in interstate commerce.

3. SAME—*Contract Limiting Liability for Damages Valid.* Where a carload of emigrant goods and live stock is shipped by rail from Crescent, Okla., to Hill City, Kan., but the point of destination is altered by order of the shipper at Salina, Kan., to Buffalo Park, Kan., the entire transportation is governed by the regulations of interstate commerce, under which a carrier may limit his liability for damages to the reasonable value of the property declared in the shipper's contract. Following *Metz v. Railway Co.*, 90 Kan. 460, 135 Pac. 667; *Adams Express Co. v. Croninger*, 226 U. S. 491.

Appeal from Sheridan district court; CHARLES W. SMITH, judge. Opinion filed March 6, 1915. Modified.

*R. W. Blair, C. A. Magaw,* and *T. M. Lillard,* all of Topeka, for the appellant.

The opinion of the court was delivered by

DAWSON, J.: F. L. Kirby shipped a carload of emi-grant goods and live stock from Crescent, Okla., to Buffalo Park, Kan., over the Santa Fe and Union Pacific railroads. The original destination was Hill City, Kan., but at Salina, Kan., where the Union Pacific received the car from the Santa Fe, Kirby ordered the destination altered to Buffalo Park. At Salina a new shipper's contract was signed by Kirby and the Union Pacific, and a new way bill was made out to cover the balance of the journey. One of the live stock was a mare worth $200, but listed in the contract of shipment at the value of $100. By the terms of his contract, Kirby was permitted to travel, without extra charge, in the trains of the carriers transporting the car, and cared for his stock personally en route. Between sundown and dark on October 30, 1912, Kirby fed and watered the mare in question while the car was in the switch yards of the Union Pacific in Salina, and the animal was apparently all right and ate and drank at that time. Next morning when Kirby entered the car at Ellis on the way to Buffalo Park the mare was dead.

Kirby sued the company, charging negligence, and recovered the value of the mare, fixed by the jury at $200. The company appealed, and here contends:

"I. The evidence not only fails to establish any negligence on the part of the appellant, but shows positively that the shipment was handled with due and proper care, and that the loss of appellee's mare was not caused by any negligence on the part of appellant.

"II. The shipment was made under a limited liability contract, and if appellee is entitled to recover any amount in this action his recovery must be limited to $100.00, the value of the mare as fixed in the contract."

No appearance is made in this court by appellee.

There is not much evidence to support the allegation of negligence, and yet we think it was sufficient to per-

mit its submission to a jury. The appellee testified that the mare was all right at nightfall in Salina; that the railway company used his car with a switch engine in making up the train, "putting it up against others and jamming it around"; and that he protested to the yardmaster.

"Q. What did you tell him? A. I told him they were using my car too rough, I had stock in there, they were using it too rough, they were liable to injure it, and he said to tend to my business, he was tending to his, and to go and get in the caboose."

At Ellis the next morning when Kirby entered the car he found the mare dead, and a partition between the live stock and the other goods was torn down and some colts tied to the partition had it under their feet; that the colts had "got over among the chickens and killed part of them"; that "part of the chickens had got out and others were loose in the car." These circumstances were some evidence of want of due care in handling appellee's car. Kirby testified:

"I went over to that side of the car and found my mare was dead. . . . There was about a half-gallon clot of blood by her nose."

A post-mortem examination disclosed no bruises or other internal injuries; there was some discoloration which might have been caused by a disease; and there is some reference in the testimony of the station agent at Ellis, who was present at the post-mortem, of "a puncture in the bowels large enough to put your thumb in"; but whether that was discovered by the examination or made by the veterinarian is not clear. The evidence for the defense controverted the appellee's testimony, and avowed due care throughout the journey from Salina to Ellis, and squarely denied that Kirby's car had been negligently used in switching in the Salina yards; appellant denied that Kirby had spoken to the yardmaster or any of the employees who were present in the yards while the train was being made

up, and denied the colloquy with Kirby. In view of this, it seems that the court was justified in submitting these disputed matters of fact to the jury under proper instructions. Appellant does not complain of the instructions, and on this point they seem entirely fair to the appellant. In part they read:

"It was the duty of the company in this case to exercise all reasonable care in transporting this animal and in handling its train in such transportation. It did not insure the plaintiff against loss by injury to the animal in handling its train so long as it handled it with such carefulness as any other like company would have handled it while in the exercise of reasonable carefulness. It could not relieve itself from the results of negligence, and it did not seek to do so in the contract of shipment received in evidence. There must be some bumping of cars in the handling of freight in transportation, and this is likely to cause animals to slip or even fall at times unless so closely packed together as to cause each to hold the other up. So it is that the law requires that the company shall avoid this if it can be done in the exercise of reasonable diligence and carefulness in handling its train."

We are not disposed to disturb a finding of negligence based on the evidence when safeguarded by such an instruction.

A more serious question arises under appellant's second assignment of error. Was the transportation of Kirby's car and contents from Salina to Buffalo Park an independent shipment originating and ending in Kansas and governed by local law, or was it a part of the service of interstate carriage from Oklahoma and governed by the laws and rules pertaining to interstate commerce?

As long ago as the case of *The Daniel Ball*, 77 U. S. 557, (1870), the supreme court of the United States held that a vessel operating wholly between points in Michigan was amenable to the regulations of interstate commerce when she was used as an instrumentality of that commerce. Mr. Justice Field said:

"So far as she was employed in transporting goods

Kirby v. Railroad Co.

destined for other States, or goods brought from without the limits of Michigan and destined to places within that State, she was engaged in commerce between the States, and however limited that commerce may have been, she was, so far as it went, subject to the legislation of Congress. She was employed as an instrument of that commerce; for whenever a commodity has begun to move as an article of trade from one State to another, commerce in that commodity between the States has commenced. The fact that several different and independent agencies are employed in transporting the commodity, some acting entirely in one State, and some acting through two or more States, does in no respect affect the character of the transaction. To the extent in which each agency acts in that transportation, it is subject to the regulations of Congress. . . . And we answer further, that we are unable to draw any clear and distinct line between the authority of Congress to regulate an agency employed in commerce between the States, when that agency extends through two or more States, and when it is confined in its action entirely within the limits of a single State. If its authority does not extend to an agency in such commerce, when that agency is confined within the limits of a State, its entire authority over interstate commerce may be defeated. Several agencies combining, each taking up the commodity transported at the boundary line at one end of a State, and leaving it at the boundary line at the other end, the Federal jurisdiction would be entirely ousted, and the constitutional provision would become a dead letter." (pp. 565, 566.)

It is true in that case that the court disavowed any purpose to prescribe a rule relating to carriers on land; but that decision foreshadowed the later development of the law, both by judicial interpretation and federal legislation.

Indeed, so rapidly has the law relating to interstate commerce expanded in recent years that a new branch of the lawyer's profession has arisen to deal with it, and the bibliography of the law of interstate commerce is growing rapidly by textbooks and judicial decisions.

As indicative of the development of the law on this general subject it may be noted that in 1892 the su-

preme court of the United States held that where goods
are shipped from one point to another within the state
of Pennsylvania, but en route were carried across part
of the state of New Jersey, such carriage was not in-
terstate commerce. (*Lehigh Valley Railroad v. Penn-
sylvania,* 145 U. S. 192.) Ten years later the case of
*Hanley v. Kansas City Southern R. Co.,* 187 U. S. 617,
decided that the transportation of goods from Fort
Smith, Ark., to Grannis, Ark., by way of the Indian
Territory, on a through bill of lading, was interstate
commerce, and the attempt to apply the state rates of
Arkansas to that transportation was properly enjoined.

With the still greater expansion of the law since 1902,
there can be no doubt that the shipment of a car of
emigrant goods from Crescent, Okla., to Hill City,
Kan., although final destination was altered, en route,
to Buffalo Park, Kan., was a shipment by interstate
carriage; nor did the making of a new contract of ship-
ment and a new way bill at Salina change the interstate
character of the shipment.

This case is not like that of *Gulf, Colorado & Santa
Fe Ry. Co. v. Texas,* 204 U. S. 403, where two cars of
grain were shipped from South Dakota to Texarkana,
Tex., and, after arriving at destination, were again
billed and shipped from Texarkana, Tex., to Gold-
thwaite, Tex. There the railway company exacted
a rate in excess of the local Texas rate on the theory
that the cars were still moving on an uncompleted
interstate journey. The railway company was prose-
cuted and convicted under Texas law for exacting the
higher rate and the supreme court of the United States
let the judgment stand. That decision was placed upon
the ground that the original interstate transportation
was completed at Texarkana. (*Leisy v. Hardin,* 135
U. S. 100; *Oregon R. & Navigation Co. v. Campbell,*
180 Fed. 253.) In the case at bar the interstate car-
riage was not completed; merely the final destination
of that interstate shipment was changed. Can it be

Kirby v. Railroad Co.

said that when goods are moving in interstate carriage, an alteration in transit of the final destination will change the interstate character of the shipment? If the railway company had granted a reduced, secret or preferential rate for the remainder of the interstate carriage to the altered destination, would it have been free from federal prosecution? On the other hand, would the company be liable under Kansas law for the exaction of a rate different from the Kansas rate from Salina to Buffalo Park? Both questions must be answered in the negative. (*Southern Ry. Co. v. Reid,* 222 U. S. 424; *Adams Express Co. v. Croninger,* 226 U. S. 491; *C. B. & Q. Ry. v. Miller,* 226 U. S. 513.)

This case is in line with a long series of supreme court decisions like *Ohio R. R. Comm. v. Worthington,* 225 U. S. 101, 56 L. Ed. 1004, where shipments of coal originating in Ohio coal fields to Cleveland, Ohio, intended for but not billed to points without that state, and no final destination fixed, were held to be interstate commerce.

One of the latest of such cases is *Baer Bros. v. Denver & R. G. R. R.,* 233 U. S. 479, 58 L. Ed. 1055. Beer was shipped from St. Louis to Pueblo, Colo., over the Missouri Pacific Railway for final destination at Leadville, Colo. At Pueblo the Denver & Rio Grande railway received the shipments from the Missouri Pacific on new way bills charging local rates from Pueblo to Leadville. This particular traffic continued for some years, and the two railroads had no arrangements for through billing. The supreme court held that the traffic was essentially interstate commerce notwithstanding the independent contracts of shipment from Pueblo to Leadville on local way bills, and that reparation for excessive rates was proper under the order of the Interstate Commerce Commission.

When this case was before the interstate commerce commission (*Baer Bros. Mercantile Co. v. Mo. Pac. Ry. Co. et al.,* 13 I. C. C. Rep. 329), it was said:

"A railroad company whose road lies entirely within

the limits of a single state becomes subject to the act to regulate commerce by participating in a through movement of traffic from a point in another state to a point in the state within which it is located, although its own service is performed entirely within the latter state." (Syl. ¶ 1.)

In the opinion Commissioner Prouty said:

"The first section of the act to regulate commerce gives this Commission jurisdiction of any 'common carrier or carriers engaged in the transportation of passengers or property wholly by railroad (or partly by railroad and partly by water where both are used under a common control, management, or arrangement for a continuous carriage or shipment), from one state or territory of the United States or the District of Columbia to any other state or territory,' etc. Since the transportation in question was entirely by railroads the words above inclosed in parentheses may be disregarded. So reading the first section the defendants would be subject to our jurisdiction provided this transportation was from one state or territory to another state or territory.

"This beer was carried from St. Louis, in the state of Missouri, to Leadville, in the state of Colorado. Every party to the transaction so understood it. It was delivered to the Missouri Pacific for the purpose of being transported to Leadville. It was received and carried by the Denver & Rio Grande with full knowledge of the fact that that company was participating in a transportation from St. Louis to Leadville. If this was not a transportation of property wholly by railroad from a point in one state to a point in another state, it would be difficult to state a case of such transportation. If it be the kind of transportation defined by the first section, then both the Missouri Pacific and the Denver & Rio Grande by participating in that movement become subject to the act with respect to the transportation itself. . . . The transportation in question, as we have already seen, was from the state of Missouri to the state of Colorado, and this was so understood and intended by the Denver & Rio Grande when it participated in the movement. This being so, it is entirely immaterial that the part of the movement performed by the Denver & Rio Grande is entirely within the state

of Colorado. *The Daniel Ball*, 10 Wall. [77 U. S.], 577."
(pp. 332, 333.)

See, also, subsequent proceedings in same case in
*Baer Brothers Mercantile Co. v. M. P. Ry. Co.*, 17 I. C.
C. Rep. 225.

Coming now to the limitation of the carrier's lia-
bility: The amendment of 1906 to the interstate com-
merce act (34 U. S. Stat. at Large, ch. 3591, p. 584)
gave positive sanction to such limitation; and since we
have seen that the appellee's shipment was one of inter-
state carriage, the value of his mare, fixed by his own
contract at $100, is all that he can recover. This is
established by federal decisions, which are bound to
control us on all questions of federal law. (*Nursery Co.
v. Nursery Co.*, 89 Kan. 522, 132 Pac. 149; *Metz v. Rail-
way Co.*, 90 Kan. 460, 135 Pac. 667; *Watt v. Railway
Co.*, 90 Kan. 466, 135 Pac. 600; *Adams Express Co. v.
Croninger*, 226 U. S. 491, 57 L. Ed. 314; *Mo., Kans. &
Tex. Ry. v. Harriman*, 227 U. S. 657; *Great Northern
Ry. v. O'Connor*, 232 U. S. 508, 58 L. Ed. 703; *Boston &
Maine Rd. v. Hooker*, 233 U. S. 97, 58 L. Ed. 868; *Atchi-
son &c. Ry. Co. v. Robinson*, 233 U. S. 173, 58 L. Ed.
901.)

In view of the foregoing it is needless to determine
whether, under the circumstances, a verdict for the
value of the mare as found by the jury could be per-
mitted to stand if the question was one of local law;
nor is it necessary to inquire if carload rates for emi-
grant movables are prescribed by the Kansas maximum
rate law. (Laws 1909, ch. 193, Gen. Stat. 1909,
§§ 7153-7155.)

This cause is remanded with instructions to the trial
court to reduce the judgment in favor of appellee from
$200 to $100, and when so modified it will be affirmed.