Miller v. Railway Co.

No. 20,119.

HOWARD A. MILLER, *Appellee*, v. THE ATCHISON, TOPEKA &
SANTA FE RAILWAY COMPANY, *Appellant*.

### SYLLABUS BY THE COURT.

INTERSTATE SHIPPING CONTRACT—*Delay*—*Damages*—*Time of Commencing Action*—*Divisible Contract*. A contract for the transportation
of an interstate shipment of live stock on the customary printed form
used by carriers, and signed by the carrier and the shipper, contained
a provision that no action should be maintained to recover any damages for loss or injuries arising out of the transportation unless commenced within six months from the time the loss or injuries occurred. It contained also a number of provisions by which the carrier
sought to limit its liability for loss occasioned by its own negligence
which are against public policy and unenforceable. *Held*, that the
contract is not void *in toto* on the ground that it violates section 20 of
the commerce act, approved June 29, 1906, known as the Carmack
amendment; that the contract should be regarded as divisible, in view
of its general use by interstate carriers with the approval of the interstate commerce commission, and therefore plaintiff's failure to
commence his action within six months after the loss and injury occurred bars his right to recover.

Appeal from Cowley district court; OLIVER P. FULLER, judge.
Opinion filed April 8, 1916, Reversed.

*William R. Smith, Owen J. Wood, Alfred A. Scott,* and *Harlow Hurley*, all of Topeka, for the appellant.

*A. M. Jackson*, and *A. L. Noble*, both of Winfield, for the
appellee.

The opinion of the court was delivered by

PORTER, J.: The action in the district court was to recover
damages resulting from the delay in the transportation of
cattle shipped from Akron, Kan., to Kansas City, Mo., and also
for personal injuries to plaintiff while traveling with the stock
on a shipper's pass and alleged to have been caused by negligence of the defendant. A trial resulted in a verdict and
judgment in plaintiff's favor, from which the defendant
appeals.

The answer alleged that the shipment was in accordance
with the provisions of a written contract, a copy of which was

attached to the answer, under the terms of which it was agreed that no action should be maintained by the plaintiff to recover any damages arising out of the shipment unless commenced within six months after the loss or damage occurred, and it was alleged that the action was not brought until eight months after the loss and injuries complained of. The only question involved in the appeal is whether the contract is, as alleged in plaintiff's reply, void *in toto* because it violates section 20 of the commerce act, approved June 29, 1906, known as the Carmack amendment. The trial court instructed the jury that the contract is void because of certain provisions therein whereby the defendant sought to limit its liability in violation of the federal law, and therefore instructed that the failure to bring the action within six months would not defeat the plaintiff's right to recover.

The plaintiff concedes that at the time the contract was entered into the provision requiring the action to be brought within six months was not in violation of the interstate commerce law as it then read, and that in consideration of the reduced rate of carriage it was lawful at that time to agree upon a reasonable time within which the action should be brought; but the plaintiff's contention is that because the contract contains other provisions which are contrary to public policy, and which violate section 20 of the commerce act, the contract is wholly void; that the contract in an entire one and can not be divided as to the consideration. This was the view held by the trial court.

Section 20 of the commerce act, approved June 29, 1906, reads as follows:

"That any common carrier, railroad, or transportation company receiving property for transportation from a point in one state to a point in another state shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass, and no contract, receipt, rule, or regulation shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed; *Provided*, That nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law." (Part 1, 34 U. S. Stat. at Large, ch. 3591, p. 595.)

The shipment here was interstate, and the contract was, of course controlled by the foregoing section of the federal act, which supersedes all regulations and policies of the state on similar matters. (*Adams Express Co. v. Croninger,* 226 U. S. 491, 33 Sup. Ct. Rep. 148.) In that case, as well as in *Kansas Southern Ry. v. Carl,* 227 U. S. 639, 33 Sup. Ct. Rep. 391, the supreme court of the United States has said that this provision is a statutory declaration that a contract for exemption from liability for loss occasioned by the negligence of the carrier is against public policy and void.

The contract in the present case commences with the statement that the rate named in the contract is lower than that made by the railroad company for the transportation of stock at carrier's risk and without limitation of liability, and is based upon the conditions and agreements found in the contract and upon the valuations therein fixed. It contains a recital that the company agrees to transport for the shipper "in consideration of the foregoing and of the mutual covenants and conditions hereinafter contained." The contract is made up of a large number of separate clauses. In one of these the shipper agrees to hold the company not liable for any damage to stock on account of any defects in the cars which are not reported to the agent of the company in writing by the shipper. In another clause the shipper agrees that where the company shall furnish laborers to assist in the loading and unloading of stock it is understood that they are furnished for the accommodation of the shipper and shall be deemed the employees of the shipper while so engaged, and the company will in no wise be liable for their negligence. In the sixth numbered clause of the contract the shipper assumes and releases the company from risk of loss, injuries and delays caused by "any mob, strike, threatened or actual violence to real or personal property, or by the refusal of the company's employes to work or otherwise, or by failure of machinery, engines or cars, or injury to tracks or yards, storms, washouts, escape or robbery of any of said stock, overloading cars, fright to animals, or crowding one upon another, or from any and all other causes whatever."

On the back of the shipping contract and as part of it the shipper or person in charge of the stock, in consideration of

the free pass granted him, agrees that the company shall not be liable for any injury or damage sustained by him while in charge of the stock or on his return passage.

The contract is the usual shipping contract, which has frequently been before this court in actions involving the validity of some particular clause thereof, and is apparently the form in general use by common carriers. The question here involved has never before been suggested in this court. We have not been referred to any cases where the federal courts in passing upon the provisions of section 20 of the commerce act, known as the Carmack amendment, have had the precise question before it. The authorities upon which plaintiff mainly relies, aside from the decisions holding that certain of the provisions in this contract are void as against public policy, are cases which declare the doctrine announced in *Peckham v. Lane,* 81 Kan. 489, 106 Pac. 464, where a contract was held to be invalid on the grounds of public policy, there being no statute law prohibiting the act which furnished the consideration, nor any penalty fixed by law. In that case the substantial consideration for the conveyance of certain land to Peckham was the location of a station upon lands of defendant. The selection of the site for the station was an act committed to Peckham in his capacity as an officer of the corporation. It was held that the contract showed on its face that Peckham sought to derive a personal benefit from an act performed by him in behalf of the company in which he was bound to be guided only by regard for its welfare, and that because all contracts which tend to place officers under an inducement to disregard their duties to the corporation and to decide questions from a standpoint other than that of the company's good are void on grounds of public policy, therefore Peckham could maintain no action upon the contract. In this class of cases the contract is held to be against public policy on moral considerations, and as was said in the opinion, "the authorities are practically unanimous" in holding that such a contract constitutes a fraud or breach of trust on the part of the person who stands in a fiduciary relation to others. We think it is quite evident that the reasons for holding contracts of this character unenforceable can not be said to apply to the contract in the present case.

Another line of authorities relied upon is illustrated by the recent case of *Ridgway v. Wetterhold,* 96 Kan. 736, 153 Pac. 490. The contract there was to convey an interest in a patent right, the vendor having failed to comply with the provisions of a statute forbidding sales of any interest in a patent right unless the letters patent had first been filed for record in the county where the transaction took place. The statute declared the contract unlawful, and in addition made the owner liable to fine and imprisonment for violation of the statute. The contract was held not divisible, but entire, and being void by statute, no action to enforce any part of it could be maintained.

The contract in the present case contains a number of provisions which on their face are void. It is unnecessary to consider the reasons why they are unenforceable because they are only indirectly involved in this controversy. As to some of them, at least, it is not and can not be seriously contended that they are valid.

It will be observed that congress has not so far declared it to be a misdemeanor for the carrier to attempt to limit its liability by including in the shipping contract provisions contrary to the terms of the statute. If the statute were construed liberally it might be said even to contemplate the probability that carriers will in some instances issue receipts and formulate rules and regulations seeking to avoid the liability imposed by section 20. The statute merely declares that "no contract, receipt, rule, or regulation" shall relieve or exempt the carrier "from the liability hereby imposed." There is the further provision "that nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law."

It appears from the abstract that the defendant has filed with the interstate commerce commission its two rates for the shipment of live stock and its form of contract where, as in this case, the stock is shipped on the lower of two rates.

The common law at first made the common carrier an insurer as to freight, and recognized but two exceptions—loss occasioned by the act of God, or of the public enemy. (Angell on The Law of Carriers, §§ 67, 135, 148; *Hale v. New Jersey Steam Navigation Company,* 15 Conn. 539, 39 Am. Dec. 398.)

In the gradual development of the law in relation to carriers the courts in furtherance of justice found it necessary to add other exceptions, and so where the loss was caused by some act of the shipper the carrier was relieved of liability. (*Hart v. The Chicago & N. W. Ry. Co.*, 69 Iowa, 485, 29 N. W. 597.) Likewise the courts found it necessary to engraft other exceptions, and declared that where the loss was occasioned by act of the public authorities the carrier should not be held, and that where the injuries or loss resulted from the inherent defects or essential qualities of the articles or merchandise the carrier should be relieved from liability. (*Evans v. Fitchburg Railroad Company*, 111 Mass. 142, 15 Am. Rep. 19.) It finally came to be held by the courts generally that the carrier may limit its liability to a certain extent by special contract, but these contracts being in derogation of common law have always been strictly construed and never enforced unless shown to be reasonable. (*Hinkle v. Railway Co.*, 126 N. Car. 932, 36 S. E. 348, 78 Am. St. Rep. 685.) Other exceptions were allowed where the strict common-law rule would work great hardships on the carrier, such, for instance, as where goods of great value, or subject to extra risk, were delivered to the carrier without notice of their character and contrary to published notices requiring shippers to inform the carrier of the extrahazardous nature or value of the goods. A very important modification in recent years is that the carrier is permitted by special contract to limit the amount of damages for which it shall be liable in consideration of accepting the goods at the lower of two published rates of which the shipper is given the choice, but the amount of damages must be reasonable. (*Christl v. Railway Co.*, 92 Kan. 580, 141 Pac. 587; *Kirby v. Railroad Co.*, 94 Kan. 485, 146 Pac. 1183.)

We have a statute which declares that "no railroad company shall be permitted, except as otherwise provided by regulation or order of the board [Public Utilities Commission], to change or limit its common-law liability as a common carrier." (Gen. Stat. 1909, § 7216.) Construing a similar provision in the old law of 1883, the opinion in *Railway Co. v. Sherlock*, 59 Kan. 23, 51 Pac. 899, said:

"The question whether upon common-law principles a common carrier may stipulate with the shipper for exemption from its common-law lia-

bilities is a vexatious and confusing subject of controversy in the courts. By some it is held that the public nature of the business of carrying imposes upon those who assume the conduct of such business, the obligations named, from which they can relieve themselves by no act of their own; that such obligations are conditions annexed to the office, from which the carrier can be exempted only by legislative enactment. Other and perhaps a greater number of cases hold that, while the law will not permit the carrier to contract for immunity from the consequences of its own negligence, it will allow it to agree with the shipper upon the extent of its liability in case of loss by the acts of others or by its own nonnegligent accidents; and still others hold that, while it may not stipulate for total exemption from liability for its own negligence, it may, nevertheless, as in the case of the insurance feature of its obligation, agree upon the extent of its liability in case of loss or injury through its own negligence. . . . What the common law in question really is, has been a subject of contrary opinion in this state. *Express Co. v. Foley*, 46 Kan. 457-472, 26 Pac. 665." (p. 27.)

The fact that the law respecting the right of common carriers of goods to limit by special contract the nature and extent of their liability for loss of this kind has so long remained in a state of comparative uncertainty, subject more or less to change and development by judicial interpretation, furnishes some excuse for the prevailing custom of the carriers to continue to issue bills of lading and shipping contracts containing provisions whereby the carriers seek to limit their liability in respect to matters where the question of their power so to do is involved in doubt. It is obvious, however, from a consideration of the terms and complex provisions of the bill of lading in question that the form of the contract needs drastic revision, eliminating therefrom numerous stipulations and provisions by which the carrier attempts to limit its liability for injuries and loss occasioned by its own negligence and that of its servants—provisions which have long been held by courts everywhere as having no force or virtue because contrary to public policy, conditions and terms which have no binding effect upon the shipper and which are never seriously relied upon by the carrier as defenses.

Section 20 of the commerce act has been in force since 1906. Congress has made elaborate provision for the regulation of interstate carriers by the interstate commerce commission, but it has so far not seen fit to prohibit in express terms the issuing of contracts containing these objectionable conditions.

Meanwhile, the interstate commerce commission has permitted the railways to file with it and publish tariffs based upon a form of contract identical with the one in question. The federal courts and this court have repeatedly upheld the validity of the provision requiring that no action to recover damages to live stock. sustained during transportation shall be maintained unless the shipper give notice in writing to the carrier before the stock has mingled with other stock, and unless the action is commenced within a stipulated reasonable time after the loss or injury occurs. (*Nursery Co. v. Nursery Co.*, 89 Kan. 522, 132 Pac. 149; *Ray v. Railway Co.*, 90 Kan. 244, 133 Pac. 847; *Watt v. Railway Co.*, 90 Kan. 466, 135 Pac. 600; *Christl v. Railway Co.*, 92 Kan. 580, 141 Pac. 586; *Kirby v. Railroad Co.*, 94 Kan. 485, 146 Pac. 1183; *Broadhead v. Railway Co.*, ante, p. 222, 155 Pac. 20; *Adams Express Co. v. Croninger*, 226 U. S. 491, 33 Sup. Ct. Rep. 148; *Kansas Southern Ry. v. Carl*, 227 U. S. 639, 33 Sup. Ct. Rep. 391.)

In other words, the federal and state courts as well as the interstate commerce commission have apparently construed the contract in question not as an entire, but as a divisible one, and the provisions as to notice and the time within which actions may be brought as conditions precedent to the right to maintain the action. Up to this time sound public policy in respect to interstate carriers has been more concerned in securing uniformity in the rights and privileges granted to shippers, interstate and intrastate, than in guarding against attempts by carriers to secure unfair advantages by including in their shipping contracts provisions that are unenforceable. The courts in recent years have quite uniformly ignored these unlawful provisions and the public has not suffered. The tendency of legislative thought and of public policy is more and more toward uniform bills of lading, and doubtless when congress or the interstate commerce commission prescribes a form of special contract for shipments of live stock all unlawful and objectionable provisions will be eliminated.

It is against public policy to permit a common carrier to escape liability for loss and injury occasioned by its negligence, and for that reason certain provisions in the contract in question are void; but this is the extent to which the decisions and authorities have gone. It is not necessarily con-

trary to any public policy so far declared by the courts generally or by congress for an interstate carrier to insert in its shipping contracts provisions which for reasons of public policy the courts will not enforce.

Aside from plaintiff's neglect to give certain notices of his loss as provided for in the contract, the failure to bring his action within six months after it accrued as provided in the ninth clause of the contract is fatal to his right to maintain the action (*Watt v. Railway Co.*, 90 Kan. 466, 135 Pac. 600), and this applies to the cause of action for personal injuries as well as that for loss and injury to the live stock (*Barber v. Railway Co.*, 86 Kan. 277, 120 Pac. 359; *Koster v. Railway Co.*, 95 Kan. 109, 147 Pac. 798; *Enright v. Railway Co.*, 96 Kan. 546, 152 Pac. 629).

Plaintiff's testimony that he did not know there were two rates for the transportation of live stock until after the loss occurred can not avail him. The published tariffs were notice to him. (*Christl v. Railway Co.*, supra; *Kansas Southern Ry. v. Carl,* supra.) The shipping contract contained a statement that the agreement to carry the stock at the lower of the two rates was a part of the consideration. Plaintiff admitted that he had made one or two shipments of stock each year for several years and knew that he would be required to sign the contract; that the contract in this case was handed to him ten minutes before the train left. He was given a duplicate copy of the contract, which he used to secure his return transportation. He can not now be heard to say that the shipment was not made upon the written contract. (*Hayes v. Railway Co.*, 84 Kan. 1, 113 Pac. 421; *Barber v. Railway Co.*, supra.)

The judgment is reversed with direction to enter judgment for defendant.