No. 20,572.

WILLIAM J. KIRSCH, *Appellee*, v. THE POSTAL TELEGRAPH CABLE COMPANY, *Appellant*.

### SYLLABUS BY THE COURT.

1. TELEGRAM—*Nondelivery—Negligence—Contract Limiting Liability for Damages—Valid.* Under the Carmack amendment (Part 1, 36 U. S. Stat. at Large, ch. 309) an interstate telegraph company may by contract limit its liability for nondelivery of an unrepeated message to the amount paid for its transmission even in case of gross negligence.

2. SAME—*Negligence of Connecting Carrier.* The initial carrier is liable for the negligence of any of its connecting carriers.

Appeal from Saline district court; DALLAS GROVER, judge. Opinion filed April 7, 1917. Reversed.

*David Ritchie, G. A. Spencer,* both of Salina, and *W. W. Cook,* of New York, N. Y., for the appellant.

*Frank T. Knittle,* and *Thomas L. Bond,* both of Salina, for the appellee.

The opinion of the court was delivered by

WEST, J.: The petition alleged, among other things, that the plaintiff entered into a contract by which for fifty-five cents paid the defendant the latter agreed to transmit a certain message without unnecessary delay. That the defendant "recklessly, maliciously, carelessly, wantonly and with total and entire disregard of the rights of the plaintiff, failed, neglected and refused to deliver said message . . . or to make any effort to do so, and failed, neglected and refused to transmit said message . . . and never at any time attempted to comply with its agreement to transmit and deliver said message as aforesaid." The answer averred among other things that the message was written on a blank, à copy of which was attached, containing a provision on its face as follows: "Send the following message, without repeating, subject to the terms and conditions printed on the back hereof, which are hereby agreed to"; that this provision was signed by the plaintiff and made a valid contract; that on the back was a statement that it was agreed that the company should no be liable for "mistakes or delays in the transmission or delivery, or for nondelivery, of any unrepeated message, beyond the amount received for sending same"; that the message in question was an unrepeated one and no toll was charged except for such a message. Also that the blank contained a provision that the company "is hereby made the agent of the sender without liability to forward any message over the lines of any other company when necessary to reach its destination," and that the message in question was correctly transmitted to the Postal Telegraph Cable Company of Missouri, and if any negligence occurred it was not on the lines or in the office of the defendant.

To these defenses the plaintiff demurred. The court sustained the demurrers and the defendant appeals.

The Carmack amendment of June 18, 1910 (Part 1, 36 U. S. Stat. at Large, ch. 309, pp. 539, 544), is invoked. In *Bailey v. Telegraph Co.*, 97 Kan. 619, 156 Pac. 716, it was said:

"By this act interstate commerce in telegraph messages is placed under the control of the interstate commerce commission. Under this act, common carriers of interstate commerce may limit the amount of the recovery on account of damage inflicted to the property of a shipper by the carrier's negligence, and these limitations have been held valid and binding. (*Kirby v. Railroad Co.*, 94 Kan. 485, 146 Pac. 1183, and cases there cited; *Horse & Mule Co. v. Railway Co.*, 95 Kan. 681, 683, 149 Pac. 436; *Ray v. Railway Co.*, 96 Kan. 8, 149 Pac. 397.) The rules that justify common carriers of interstate commerce in limiting their liability for their negligence also justify interstate carriers of telegraph messages in limiting their liability for their negligence." (p. 623.) (See opinion denying rehearing, 99 Kan. 7.)

In the Bailey case the petition alleged gross negligence and prayed for exemplary damages. The decision therein, together with the authorities cited, settled the rule in this state that under the Carmack amendment a contract limiting the liability of the carrying company is to be upheld whether the negligence be ordinary or gross.

That the initial carrier is responsible for the nondelivery appears from the language of the Carmack amendment itself and has been repeatedly announced by the federal supreme court. In *Atlantic Coast Line v. Riverside Mills*, 219 U. S. 186, it was said:

"Reduced to final results, the Congress has said that a receiving carrier, in spite of any stipulation to the contrary, shall be deemed, when it receives property in one State to be transported to a point in another involving the use of a connecting carrier for some part of the way, to have adopted such other carrier as its agent, and to incur carrier liability throughout the entire route, with the right to reimbursement for a loss not due to his own negligence." (p. 205.)

In *Kansas Southern Ry. v. Carl*, 227 U. S. 639, in speaking of the Hepburn act it was said: "The express terms of the act make the carrier liable for any loss caused by it, and provides that no contract shall exempt it from the liability imposed." (p. 647.) In *Norfolk & W. Ry. Co. v. Dixie Tobacco Co.*, 228 U. S. 593, it was held that stipulations in a bill of lading for interstate shipment that no carrier shall be liable for damages not occurring on its portion of the through route, are void. And that the initial carrier is liable whether the

through route connections are designated by it or by the shipper.

It is contended by the plaintiff's counsel that while a carrier may limit its liability for ordinary negligence it can not thus stipulate in respect to its gross or wanton negligence. Realizing the force of this suggestion, we can and must reply that congress has taken this matter into its own hands in cases of interstate shipment, and having, according to the decisions already referred to, permitted carriers to make such stipulations the matter is beyond our power. It appears, therefore, that the demurrer to the second and third subdivisions of the answer was erroneously sustained.

A few observations not essential to the decision herein may be permitted, the writer speaking for himself only. In the Croninger case, 226 U. S. 491, it was said that a carrier could, at common law, by a "fair, open, just and reasonable agreement" limit the amount recoverable by a shipper in case of loss or damage to an agreed value, and that a stipulation covering such limitation is not forbidden by the Carmack amendment. In numerous cases receipts or bills of lading in railroad shipments have been before us. In this case the contract pleaded is the ordinary telegraph blank. On the face, in white letters upon a blue background so arranged as naturally to attract no attention whatever, are these words: "The Postal Telegraph Cable Company (Incorporated) transmits and delivers this message subject to the terms and conditions printed on the back of this blank." Underneath this, in dark blue type on white background, are the following words: "Send the following Telegram, subject to the terms on back hereof, which are hereby agreed to." On the back, in blue type on white background, is the name of the company, with a map of what is called the greatest telegraph and cable system in the world and a statement in large type that the Postal Telegraph Cable Company "Transmits and delivers the within telegram subject to the following terms and conditions:" These terms and conditions are printed mostly in small type and underneath them is a line in large type as follows: "The fastest telegraph service in the world."

No quarrel is to be had with the proposition that congress has the power to permit interstate carriers to limit their lia-

bility by a "fair, open and just contract," but everybody knows that the great majority of folks who patronize public service corporations never have the remotest idea that in sending a telegram they are entering into a formal contract with the carrier. The farmer who occasionally ships a little live stock or the workingman who gets a job in another town and has to ship a few household goods and sends or goes to the depot to find the cost of the shipment is handed a yellow sheet of paper, ostensibly for the purpose of showing that he has paid the freight. Afterwards, in case of loss and an attempt to collect, he is informed and made to understand for the first time that by accepting such paper he became a party to a contract printed on the back thereof.

The average person who once in a great while has need to send a telegram, usually in case of excitement or grief, goes or sends to the telegraph office and writes a message on a blank furnished him, and in case of its nondelivery and an attempt to collect damages is advised and made to understand for the first time that by signing the message he entered into the contract printed, mostly in very fine type, on the back of a blank, not one word of which was called to his attention or was ever a matter of consciousness on his part. Everybody knows that under such circumstances no contract is in fact entered into. The minds of the parties can not meet because nothing whatever has caused them to comprehend or act upon a thing utterly unobserved and unrecognized by the shipper or sender. To understand the contract on the back of the blank in this case the average citizen would need the help of at least one microscope and one lawyer. To say that he ever entered into such a contract is to express as absurd a notion as could be imagined.

If common carriers who hold themselves out to serve the public are to be permitted to assert under such circumstances that their patrons have entered into contracts they ought to be required to couch such contracts in plain terms and have them fairly and honestly called to the attention of the shipper before their patronage is accepted.

The judgment is reversed and the cause remanded for further proceedings.

DAWSON, J. (concurring specially): The decision is all right, but some observations in the opinion prompt me to add

that the fine print in the contract is the public service corporation's only protection against the perjury of witnesses and against the credulity, the prejudice, and the downright insincerity of juries. The latter are the real hindrances to the correct administration of justice, although reformers have yet to make this discovery.