No. 41,621

The McNally Pittsburg Manufacturing Corporation, *Appellee,* v. The Western Union Telegraph Company, a corporation, *Appellant.*

(353 P. 2d 199)

Opinion filed June 11, 1960.

*Douglas Hudson,* of Fort Scott, argued the cause, and *Howard Hudson* and *Douglas G. Hudson,* both of Fort Scott, and *John H. Waters,* of New York, New York, were with him on the briefs for the appellant.

*Paul L. Wilbert* and *John B. Towner,* both of Pittsburg, argued the cause, and *A. B. Keller,* and *Randall D. Palmer,* both of Pittsburg, were with them on the briefs for the appellee.

The opinion of the court was delivered by

Robb, J.: Plaintiff (appellee) sued defendant (appellant) in a tort action for damages resulting from an error due to defendant's negligent transmittal of a telegram sent by plaintiff to twenty-two contractors. The jury returned a verdict in favor of plaintiff for $10,000 and the trial court entered judgment for that amount. De-

fendant appeals from the judgment and an order overruling a motion for new trial, as well as from orders and rulings on other motions.

Defendant (Western Union) emphatically states that it has never relied on conditions or limitations printed on any telegraph blank and attention is directed to the following pertinent statements made in its brief:

"The instant case involves no contract issue.

". . . this defendant did not plead, did not offer in evidence and did not submit in any way any conditions or limitations as printed on any telegraph blank as a defense to plaintiff's cause of action.

"The defendant fails to perceive how it could have abandoned a question about the conditions printed on the telegraph blank when it had never adopted or suggested any such ground of defense."

In the trial court defendant objected to an instruction as follows:

"Object to plaintiff's requested instruction No. 5, which relates to the matters printed upon the back of a message for the reason that we are not relying upon any matters, no issue joined in any way by what is printed on the back of a telegram. *We are relying on filed tariffs.* . . ." (Our emphasis.)

In view of the foregoing statements of counsel, a defense of conditions or limitations resulting from stipulation or contract, if any there were, is not now and never was a part of this case and we shall not consider, discuss, or decide any such issue in this appeal.

Between 7:00 and 8:00 p. m. on January 30, 1958, Cass Levi, plaintiff's industrial sales manager, sent, as an unrepeated message, the following:

"WE QUOTE $33,285.00 F. O. B. SITE FOR ALL ITEMS SHOWN ON DRAWING SHEET 37 KANSAS TURNPIKE PROJECT # 2."

The above-quoted words and figure were handprinted on plain white paper. Each letter of every word was clearly legible and the figure $33,285.00 was so distinct that anyone with ordinary vision could easily have read it. Attached thereto was a list of twenty-two contractors' names and addresses typed on a Kansas Turnpike Authority letterhead. Contractor No. 17 on the list was the J. A. Tobin Construction Company (hereafter referred to as the Tobin Co.), Kansas City, Kansas. The items referred to were bridge bearing devices to be used in the construction of the Kansas Turnpike Eighteenth Street viaduct, bridge "D," in Kansas City.

At 8:30 a. m. on Friday, January 31, 1958, defendant delivered the message to the Tobin Co. but the figure read $22,285.00 which was considerably lower than other quotations and Robert A. Mandigo, engineer for the Tobin Co. in charge of the Turnpike bid and

contract, made a telephone call to a third party to check McNally-Pittsburg's ability to perform. After receiving favorable information thereon, he submitted the Tobin Co. bid based on the $22,-285.00 figure at the required time which was 10:00 on January 31, 1958, at the Town House Hotel in Kansas City, Kansas. As the low bidder, the Tobin Co. was awarded the contract during the afternoon of January 31, 1958.

At 2:00 p. m. on January 31, 1958, Mandigo called McNally-Pittsburg (plaintiff) by telephone and asked to speak to Cass Levi. Levi was not available but Mandigo testified as follows concerning a conversation he had with Tom McNally:

"I called him, told him we were low *bids* on the Kansas Turnpike and we were going to use his quotation and he said he wasn't familiar with the quotation, he would get hold of Cass Levi or Ed McNally and take care of it."

At the conclusion of the above conversation Mandigo made the following notation on the wire received by the Tobin Co., which was an admitted exhibit at the trial:

"ORDER CONFIRMED TO TOM MCNALLY."

At 3:59 p. m. on January 31, 1958, McNally-Pittsburg received a confirmation of the list of twenty-two addressee contractors, including the Tobin Co., at the bottom of which appeared a confirmation of the wire:

"WE QUOTE # 33,285.00 F. O. B. SITE FOR ALL ITEMS SHOWN ON DRAWING SHEET 37 KANSAS TURNPIKE PROJECT # 2
"CASS LEVI MCNALLY PITTSBURG MFG CO PITTSBURG KANSAS"

No controversy exists regarding the fact that the error of $11,000 was made by defendant in the transmittal of the telegraph message in this case. To determine this appeal it is unnecessary to probe further into the subsequent events except to say that neither the Tobin Co. nor McNally-Pittsburg learned of the error until Monday, February 3, 1958.

Counsel for both parties in this appeal have presented unusually good records and briefs which are always helpful and appreciated by an appellate court.

The first point of argument is whether there was any evidence to support the jury's special finding (1) that there was a contract entered into between McNally-Pittsburg and the Tobin Co. and (2) that the date thereof was January 31, 1958.

The trial court gave one of defendant's requested instructions, which explained the word "quote," but since there was no cross

appeal therefrom plaintiff's argument as to the correctness of the instruction is immaterial because that instruction became the law of this particular case. The instruction requires the party quoting a price to accept the price so made to complete the transaction. We have no way of knowing with certainty how the jury arrived at its answer but, as already mentioned, after the Tobin Co. had been awarded the contract by the Kansas Turnpike Authority, Mandigo called McNally-Pittsburg and his testimony as to his conversation with Tom McNally, heretofore set out, constitutes some substantial competent evidence wherefrom the jury could have made the finding it did, and under *Foy Construction Co. v. Board of Education,* 183 Kan. 25, 325 P. 2d 53, we are bound thereby:

"Where findings of fact are attacked for insufficiency of evidence or as being contrary to the evidence, this court's power begins and ends with a determination whether there is any competent substantial evidence to support them, and where findings are so supported they are accepted as true and will not be disturbed on appeal." (Syl. ¶ 1.)

Defendant contends that Tom McNally in his conversation with Mandigo in effect said that he (Tom) did not know what Mandigo was talking about, but that he would find out about it. We cannot subscribe to this interpretation of the conversation and apparently the jury, in view of its special findings and verdict, did not believe this to be the interpretation. We are bound by the findings and verdict of the jury. Attention is again directed to the Foy case where the appropriate rule is stated thus:

"The fact there is evidence which, if believed, would support a finding contrary to that reached by the trial court is of no concern on appellate review." (pp. 32, 33.)

To follow defendant's contention that McNally-Pittsburg did not interrogate Tom McNally, who was present throughout the trial, and therefore the finding was contrary to the evidence is not well-founded because it is not our province to weigh the sufficiency of the evidence nor do we mean to infer we have any doubt but that there was other evidence which the jury may have considered.

A careful study of the Foy case shows that inherent in this court's affirmance of the trial court's judgment, contained verbatim in that opinion, is the rule that when the bid of a contractor is accepted and the bidder is awarded the contract, it becomes final and binding.

This also answers defendant's second contention because under *Culver & Co. v. Warren,* 36 Kan. 391, 393, 13 Pac. 577, defendant was McNally-Pittsburg's agent.

The jury's special finding that a contract was entered into on January 31, 1958, and the additional fact that the contract was let by the Kansas Turnpike Authority on the Tobin Co. bid, meant that McNally-Pittsburg was bound to perform just the same as the Foy Construction Company was bound to perform in that case notwithstanding the fact it claimed a mistake was made, which contention the jury saw fit to disbelieve. No dispute appears as to the probability of the Tobin Co. not taking the bridge bearing contract at $33,285.00 but when it received the "quote" of $22,285.00 that figure was made a part of the contract price and submitted with the over-all figure of the bid upon which the contract was let. It is not logical to say that the Tobin Co. should be expected to pay more than the quoted price of the bridge bearing devices after the contract was let and the telephone conversation was had between Mandigo and Tom McNally. As to the damage feature, Ed McNally's testimony was to the effect that had they not been successful in this particular offer, they would have had to seek other work to fill in the gap and keep production going. The contract was made but for a lower figure than the intended contract price. In *Milling Co. v. Postal Telegraph Co.*, 101 Kan. 307, 166 Pac. 493, to be discussed later herein on other features, the damages depended upon the difference between the 4000 bushels of wheat at the price contemplated by the telegraphic message and the price plaintiff had to pay as a result of having to obtain 4000 bushels of wheat elsewhere to fulfill its contractual order. If damages in the Milling Co. case were proper, then there was sufficient substantial competent evidence on damages here to support this jury's verdict. (See anno. 154 A. L. R. 719, 720, for discussion of the damage feature in the Milling Co. case.)

Thus, when defendant, as plaintiff's agent, erroneously delivered the quotation of $22, 285.00 to the Tobin Co., which used that quotation in its bid, the Tobin Co., as low bidder, was awarded the construction contract for the Kansas Turnpike Authority, and plaintiff was then bound to perform on that basis.

At the outset in discussing the principal issue in this appeal, that is, defendant's right to limit liability, it should be understood the controlling statutes (certain sections of Art. 1, Chap. 66, Laws 1949) were enacted by our legislature in 1911 (Chap. 238, §§ 3, 10, 11, 12, 20, 30) and with the exception that the name of the commission has been changed to the state corporation commission, the statutory provisions remain unchanged and since our legislature has held

many sessions subsequent to 1911 and has made many changes in other sections of our statutes but has not seen fit to make any change in the sections controlling the question now before us, it becomes apparent the legislature has been satisfied with the court's interpretation of the extent of the power and authority conferred upon the commission with regard to the question involved which *is* indeed far-reaching in its implications because it will greatly affect not only defendant but also many businesses and industries transacting *intrastate* business in Kansas.

In *Milling Co. v. Postal Telegraph Co.*, supra, (1917) the defendant in transmitting a telegraphic message erroneously used the code word "flirting" which meant 6,000 bushels of wheat, instead of the sender's (plaintiff's) code word "fluting," which meant 10,000 bushels, and this court (after stating that the question of limitation of liability is settled as to *interstate* messages and citing Kansas cases in support thereof [p. 310]) further stated:

"The case at bar involves only an intrastate telegraph message, and we have no state statute specifically authorizing common carriers to limit their common law liability as does the Carmack amendment (Part 1, 36 U. S. Stat. at Large, ch. 309, pp. 539, 544); and telegraph companies are somewhat analogous to carriers; but we do have a statute giving countenance to such limitation by railroad carriers upon the order or approval of the public utilities commission. (Gen. Stat. 1915, § 8435.) There is certain language in the public utilities act which seems to recognize the telegraph company's right to limit its liability. The schedules, classifications, rates, rules and regulations for telegraph service must be reasonable and just, and the commission may amend or alter them. (Gen. Stat. 1915, §§ 8390, 8408); any matter concerning such public-service business which is unreasonable, unjust, or discriminative must be investigated and corrected. (§ 8416.) The requirement that telegraph companies file their rates with the commission, and the section which fixes as legal maxima the rates in vogue on January 1, 1911 (§ 8358), and the unchallenged exaction and maintenance of those rates, and upon the conditions attaching thereto in the telegraph company's contracts of service are potent reasons for recognizing reasonable limitations of liability of the telegraph company as valid and binding." (p. 310.)

The foregoing is followed by a clear and concise statement in the same paragraph respecting the commission's authority and power to regulate the legal liabilities of the defendant for its negligence. It reads:

"Of course, the public utilities commission has nothing directly to do with the legal liabilities of telegraph corporations on questions of damages, but so far as their liabilities enter into the cost of conducting their business, those liabilities are a proper element of consideration in rate making. The telegraph rates are based, in part, upon the legal consequences which attach to the

service. If a higher degree of responsibility attaches to the service, a greater rate must be exacted." (pp. 310, 311.)

In the final sentence of the same paragraph, the court discussed the effect of a common carrier (or telegraph company) stipulating limitations regarding liability for its own negligence as follows:

"It has been held in this state that a common carrier (without a permissive statute) can not impose a condition exempting him from liability for his own negligence, and a telegraph company is so much like a carrier that its liability for negligence should be governed by similar principles, yet reasonable limitations of liability other than those which do not seek to excuse its gross negligence have been upheld (*Russell v. Telegraph Co.*, 57 Kan. 230, 233, 45 Pac. 598); while stipulations restricting liability to an insignificant sum where the negligence was gross have been disregarded. (*Telegraph Co. v. Crall*, 38 Kan. 679, 17 Pac. 309.)" (p. 311.)

The court in the Milling Co. case clearly presented the problem and the solution where there was a stipulation or contract by the following words:

"Here the stipulated limitation is for a return of the cost of the message, probably twenty-five or forty cents. All the annoyance, delay, business inconvenience and financial damage so commonly attendant on a telegraph company's failure to perform its self-assumed public service are limited to an insignificant trifle. Here the actual damage was $265. The stipulated reparation is a few dimes. With all due deference to the great judicial tribunals which have countenanced and enforced this stipulation, and which we have been likewise constrained to enforce in interstate matters, we can not give our independent assent that such a limitation is reasonable. It is unreasonable, and it will not be applied in intrastate business where this court would have to assume the responsibility of giving countenance to it." (p. 311.)

The Milling Co. case held:

"In conducting its intrastate business a telegraph company may make reasonable stipulations limiting its liability, but in the absence of positive or permissive statutes governing the subject, the reasonableness of any such stipulation is a question for judicial determination." (Syl. ¶ 2.)

Before leaving the above quotation, it should be noted that permissive means "Allowed; allowable; that which may be done." (Black's Law Dictionary, 4th ed. p. 1298.) Thus an appropriate statute would have to be a positive one under the rule.

To show further our court's distinction between *interstate* and *intrastate* transmission of telegraphic messages, and the commission's authority and power to regulate the legal liabilities of the defendant for damages resulting from its negligence, attention is directed particularly to two of the many cases cited because they are more closely related in point of time to the Milling Co. case.

In *Kirsch v. Telegraph Co.*, 100 Kan. 250, 164 Pac. 267, (1917) where an unrepeated interstate message was involved, the court ruled that,

"Under the Carmack amendment (Part 1, 36 U. S. Stat. at Large, ch. 309) an interstate telegraph company may by contract limit its liability for non-delivery of an unrepeated message to the amount paid for its transmission even in case of gross negligence." (Syl. ¶ 1.)

In the opinion in the Kirsch case it was stated in substance that Congress having taken this matter into its own hands in cases of interstate shipments, and having permitted carriers to make such stipulations, the matter was beyond this court's power. (p. 253.)

The case of *Klippel v. Telegraph Co.*, 106 Kan. 6, 186 Pac. 993, (1920) involved an intrastate unrepeated telegraphic message but it had to leave the state and re-enter between the place of sending (Greensburg) and the place of delivery (Hutchinson), and it thereby became an interstate transaction. The court held that the rules of the defendant telegraph company limiting its liability for damages on account of its negligence in the delivery of an *interstate* message to the amount received for sending the same were valid and binding, citing the Kirsch case and authorities therein set out.

Were the court to follow defendant's theory that the legislature had, by inference at least, granted it the power to determine the amount of its legal liability commensurate with whether the message were day, night, repeated, or unrepeated, etc., similar to the provisions of the Carmack amendment (47 U. S. C. A. § 201 [b]), we would immediately be confronted with our hard and fast rule regarding such unrestricted delegation of legislative authority which was most recently stated in *Quality Oil Co. v. du Pont & Co.*, 182 Kan. 488, 322 P. 2d 731:

"The power to fix rates or prices for the sale of services or commodities binding upon all persons whether or not they consent is a legislative power which may not be delegated by the legislature to a governmental agency, official, board, or to a private organization or person." (Syl. ¶ 1.)

In other words, we do not have a positive statute enacted by our legislature setting out the classifications of messages, as the Carmack amendment does, and our commission, unlike the Interstate Commerce Commission, cannot by its approval of limitation of liability based on classification of messages filed by the defendant with the commission thereby give such limitation of liability the force and effect of law.

To make clear that our statute does not confer the same power

upon our commission that Congress has conferred upon the Interstate Commerce Commission, and to show the comparison of the federal and state enactments, the pertinent portions of the respective legislative acts are set out as follows:

G. S. 1949, 66-107:

"Every common carrier and public utility governed by the provisions of this act shall be required to furnish reasonably efficient and sufficient service, joint service and facilities for the use of any and all products or services rendered, furnished, supplied or produced by such public utility or common carrier and to establish just and reasonable rates, joint rates, fares, tolls, charges and exactions and to make just and reasonable rules, classifications and regulations; and every unjust or unreasonable discriminatory, or unduly preferential rule or regulation, classification, rate, joint rate, fare, toll or charge demanded, exacted or received is prohibited and hereby declared to be unlawful and void, and the state corporation commission shall have the power, after notice and hearing of the interested parties, to require any common carriers and all public utilities governed by the provisions of this act to establish and maintain just and reasonable joint rates wherever the same are reasonably necessary to be put in, in order to maintain reasonably sufficient and efficient service from such public utilities and common carriers."

47 U. S. C. A. § 201 (b):

"All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is hereby declared to be unlawful: *Provided,* That communications by wire or radio subject to this chapter may be classified into day, night, repeated, unrepeated, letter, commercial, press, Government, and such other classes as the Commission may decide to be just and reasonable, and different charges may be made for the different classes of communications: *Provided further,* That nothing in this chapter or in any other provision of law shall be construed to prevent a common carrier subject to this chapter from entering into or operating under any contract with any common carrier not subject to this chapter, for the exchange of their services, if the Commission is of the opinion that such contract is not contrary to the public interest: *Provided further,* That nothing in this chapter or in any other provision of law shall prevent a common carrier subject to this chapter from furnishing reports of positions of ships at sea to newspapers of general circulation, either at a nominal charge or without charge, provided the name of such common carrier is displayed along with such ship position reports. The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter."

Nothing stated in this opinion is intended to have any relevancy with respect to whether defendant may, or may not, enter into contracts with its customers limiting the extent of its liability thereunder.

Judgment affirmed.