No. 126,005

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

HERITAGE TRACTOR, INC.,
*Appellant*,

v.

EVERGY KANSAS CENTRAL, INC.,
*Appellee*.

SYLLABUS BY THE COURT

1.

The Electric Public Utilities Act, K.S.A. 66-101 et seq., vests the Kansas Corporation Commission with jurisdiction and the authority necessary to control those electric public utilities doing business in Kansas.

2.

The Kansas Corporation Commission has the right to adopt tariffs which outline the terms and conditions governing the relationship between a utility provider and its customers.

3.

A public utility's tariff structure may contain provisions which are intended to limit the utility's liability to its customers provided such tariffs are neither unreasonable nor unjust.

4.

Legally established tariffs are construed in the same manner as statutes. When a court sets out to determine the plain meaning of a tariff it looks not only to the language

used, but also the specific context in which it appears, as well as the broader context of the tariff provision in its entirety.

5.

A tariff provision drafted so broadly as to insulate a public utility from liability for every conceivable act of misfeasance, including ordinary negligence which results in catastrophic property damage, is unreasonable and unenforceable.

6.

A party seeking to establish wanton conduct bears a two-pronged burden: (1) demonstrate that the act complained of was conducted with a realization of the imminence of danger; and (2) that the act was performed with a reckless disregard for or complete indifference to its probable consequences. The conduct at issue may be either broad or specific but each component of the inquiry must address the same conduct.

7.

Whether a public utility's inspection program comprehensively encompasses the due care demanded by the extreme risk inherent to the services it provides is a question on which reasonable minds could differ, and therefore, it should be submitted to a jury for resolution.

Appeal from Douglas District Court; JAMES R. MCCABRIA, judge. Oral argument held November 14, 2023. Opinion filed July 19, 2024. Reversed and remanded.

*Court T. Kennedy*, of Gates Shields Ferguson Swall Hammond, P.A., of Overland Park, and *Michelle D. Hurley*, pro hac vice, of Yost & Baill, LLP, of Minneapolis, Minnesota, for appellant.

*John T. Bullock, J. Eric Weslander,* and *Whitney L. Casement*, of Stevens & Brand, LLP, of Lawrence, for appellee.

2

Before HILL, P.J., MALONE and ISHERWOOD, JJ.

ISHERWOOD, J.: Heritage Tractor, Inc. (Heritage), a tractor dealership, suffered over $3 million in catastrophic damage when a utility pole owned by Evergy Kansas Central, Inc. (Evergy), collapsed onto the business and started a fire. Heritage sued Evergy to recover its losses, but the district court granted Evergy's motion for summary judgment.

In a written ruling, the district court explained that Evergy was insulated from liability by virtue of its tariff structure, specifically, section 7.02(B) of its limited liability provisions. That subsection purports to limit Evergy's liability in a vast array of contexts unless Heritage makes an affirmative showing of willful or wanton conduct. The district court also found that Heritage failed to bring forth any evidence which demonstrated that Evergy acted with wanton disregard in that it was aware of the precise impending risk posed by the pole at issue and chose to disregard the same.

Heritage brings this appeal and requests our analysis of whether the district court's grant of summary judgment was erroneous. Following a careful review of the record, scrutiny of Evergy's tariff, and a thorough analysis of the governing law, we agree with the district court's implicit finding that subsections (A) and (C) of tariff 7.02 are inapplicable to this case. However, we disagree with its conclusion that subsection (B) of the tariff provides Evergy with an avenue for the immunity from liability it seeks and instead find that this subsection is overly broad and unreasonable. Finally, contrary to the district court, we are satisfied there was ample evidence from which reasonable minds could differ regarding whether Evergy's preventative measures were sufficient to materially lessen the risk of a catastrophic pole failure and conclude that the proper course of action is to submit that evidentiary dispute to a jury for resolution. Accordingly, the district court's decision granting Evergy's request for summary judgment is reversed, and this case is remanded for further proceedings.

3

*The Pole Falls*

In early May 2018, a utility pole owned by Evergy fell onto the roof of the Heritage tractor dealership and caused a fire. The subsequent investigation determined that the cause was accidental.

Two years later, Heritage filed suit against Evergy and alleged that Evergy was negligent in its maintenance of the pole by failing to inspect, repair, or replace it. Heritage further asserted that Evergy breached both express and implied warranties and committed trespass.

*The Pole and its History*

At the time of the incident, the wooden utility pole at issue was approximately 50 years into its estimated 53-year lifespan. We recognize that age should not be relied on, in isolation, as an accurate measure of pole integrity. The equipment attached to the pole accounted for 41% of the pole's strength capacity, as designated under the National Electrical Safety Code (NESC).

Evergy never experienced any problems with the pole prior to the incident, and Tim Deneke, Heritage's on-site manager who was charged with the task of managing any significant problems that arose with the business, never personally observed or fielded any concerns about the pole. In the week leading up to the fire, Deneke walked or drove past the pole almost every day and it "'[l]ooked like every other pole that was around there.'" That is, it never swayed, wobbled, or otherwise exhibited unusual movement. To Deneke's knowledge, there was never a time when Evergy failed to address issues reported by the business.

4

About six weeks prior to the pole's collapse, Heritage notified Evergy that the building's electrical service line appeared to be touching its roof. David Shockley, a journeyman lineman for Evergy, responded to the call and despite finding the service line was not actually in contact with the roof, he still removed some slack from the line. Nothing indicated to Shockley that the pole was unstable.

*Evergy's Inspection Procedures*

The Kansas Corporation Commission's (KCC) Electric Reliability Requirements did not include a specific inspection process or cycle for these poles. The NESC directs that inspection of utility equipment may be performed '"as experience has shown to be necessary.'" The record reveals that Evergy limited regular patrol-type inspections to only that equipment located within what it considered to be critical points in the community infrastructure and those installed in higher traffic areas such as parks, schools, or fairgrounds. Heritage did not meet either of those classifications. There is also evidence that Evergy limited its inspections to poles within circuits that were lesser performing. The subject pole was associated with a high performing circuit; thus, it was not scheduled for inspection.

During discovery, Nelson Bingel was deposed. He is the current NESC chairman and former Vice President of Product Strategy for Osmose Utilities, the company that performed inspections for Evergy. He testified that the recommendation was for Evergy to inspect its wooden utility poles, such as the one that failed here, every 10 years and the company was previously notified that its inspections did not meet expectations. Further, there was evidence to indicate that the pole was never subjected to an inspection by Evergy during its 50-year lifetime and, at the time of the collapse, there was significant advanced decay though its cross-section.

Beyond scheduled inspections, Evergy relied on its employees' judgment, experience, and training to notice whether equipment was damaged. For example, its linemen were instructed to insert an awl or screwdriver into a pole's base to gauge its soundness before scaling it for service. In the event that endeavor yielded any sign of instability they had the authority to order a pole changed immediately. Again, lineman Shockley allegedly performed the soundness test when responding to the service call six weeks before the pole fell and did not uncover any issues with the pole.

*The District Court's Summary Judgment Decision*

Evergy moved for summary judgment and argued that the terms of its tariff with the KCC, specifically under sections 7.02(A), (B), and (C), insulated it from liability for mere negligence, and therefore, to obtain relief Heritage had the burden to affirmatively show that its damages were the result of Evergy's wanton conduct. According to Evergy, Heritage could not sustain this burden because its claims amounted to "garden-variety negligence," and no facts "even remotely" suggested that Evergy allowed the pole to remain in place despite knowledge of its dangerous condition. Evergy also asserted that Heritage's two other causes of action did not offer a work-around from the tariff.

Heritage responded that the tariff provisions Evergy relied on to shield it from liability were only applicable within the contexts addressed by each subsection, none of which materialized here, and, to the extent the district court disagreed with that position, the tariffs also could not offer a foundation to avoid liability because the scope of their purported limitations on liability abrogated Kansas common law, which rendered them unenforceable and unreasonable. Finally, Heritage argued there was sufficient evidence for a jury to conclude that the pole eventually gave way because of Evergy's wanton conduct, a claim permitted under the tariff, so summary judgment was not appropriate.

6

After a hearing, the district court granted Evergy's motion for summary judgment. It determined that whether Evergy could have followed a better utility pole inspection protocol was a question grounded in negligence, and section 7.02(B) of the KCC tariff protected Evergy from liability for ordinary negligence under the circumstances presented. Thus, Heritage's sole avenue of relief lied with its ability to prove that Evergy's practices amounted to wanton conduct, but it failed to controvert any material fact or make any affirmative showing that Evergy acted with wanton disregard. The court elaborated that Heritage neglected to establish that Evergy's failure to inspect the pole on a 10-year cycle was somehow material to the case or offer any evidence which proved that Evergy was put on notice that there was an impending risk that this specific pole could cause harm or damage, but nevertheless opted to act with a concurrent disregard of that risk. The court concluded there were no facts upon which a reasonable juror could rely to conclude that Evergy engaged in wanton conduct. Therefore, it would be improper to allow the case to proceed to a jury.

The district court then summarized what it believed were the uncontroverted facts: no Heritage employee observed anything out of the ordinary with the pole prior to the fire; Evergy directs its linemen to gauge poles for soundness prior to climbing them; an Evergy lineman responded to a service call at Heritage approximately six weeks before the incident and reported no irregularities with the pole; and finally, the KCC's Electric Reliability Requirements do not mandate a specific inspection cycle for poles.

Finally, the district court rejected Heritage's claim that the tariff was unenforceable or unreasonable as an abrogation of common law, citing the Kansas Supreme Court's holding in *Danisco Ingredients USA, Inc. v. Kansas City Power & Light Co.*, 267 Kan. 760, 774, 986 P.2d 377 (1999), for support. The district court opined that *Danisco* stood for the proposition that tariffs which limit the liability of utility providers such as Evergy to only acts of wanton conduct are enforceable and in alignment with Kansas' public policy.

7

Heritage now appeals the case to us and requests that we analyze the propriety of the district court's summary judgment decision.

LEGAL ANALYSIS

*Overview of Tariffs*

Heritage has presented four questions for us to review in this case, nearly all of which arise out of the tariffs drafted by Evergy. Before embarking on the respective analyses required to resolve each of those claims, we believe it is appropriate, and helpful, to offer an overview of how tariffs manifest and the role they are designed to serve.

In Kansas, the regulation of public utilities is legislative—not judicial. *Grindsted Products, Inc. v. Kansas Corporation Comm'n*, 262 Kan. 294, 309, 937 P.2d 1 (1997). As a utility provider, Evergy is regulated by the KCC. The Electric Public Utilities Act, K.S.A. 66-101 et seq. (EPUA), in turn gives the KCC "full power, authority and jurisdiction to supervise and control the electric public utilities, as defined in K.S.A. 66-101a, doing business in Kansas," and empowers the KCC to "do all things necessary and convenient for the exercise of such power, authority and jurisdiction." See K.S.A. 66-101 et seq.; K.A.R. 82-1-201 et seq. Every public utility doing business in Kansas is controlled by the KCC and is required to publish and file with the KCC copies of all schedules, rates, rules, regulations, and contracts. See K.S.A. 66-101c.

In the interest of the public and the utility's customers, the Kansas Legislature granted the KCC the authority to adopt tariffs, or rules, effective against public utilities. See K.S.A. 66-101 et seq. Those tariffs also outline the terms and conditions which govern the relationship between a utility provider and its customers. *Danisco*, 267 Kan. at 765; *Southwestern Bell Tel. Co. v. Kansas Corporation Commission*, 233 Kan. 375, 377,

664 P.2d 798 (1983). While these tariffs are frequently crafted by the regulated utility, they are not permitted to be unjustly or unreasonably discriminatory nor unduly preferential. Tariffs must comport with any conditions, schedules, and provisions authorized by the regulatory agency, and amended tariffs and schedules of rates are not effective unless approved by the KCC. *Grindsted*, 262 Kan. at 309.

Certain tariff provisions are referred to as liability limitations and are justified by the theory that because a public utility is subject to strict regulations, its liability should be expressly defined and limited so as not to undermine its ability to offer its service at reasonable rates. That is, a reasonable rate is dependent, in part, on rules which limit a provider's liability. *Danisco*, 267 Kan. at 769. Once those tariffs are duly filed with the KCC, they generally bind both the utility and the customer. *Farmland Industries, Inc. v. Kansas Corporation Comm'n*, 29 Kan. App. 2d 1031, 1043, 37 P.3d 640 (2001). However, neither the Electric Public Utilities Act, nor prior caselaw interpreting the same, explicitly vests either the utility or the KCC with the authority to craft tariffs which place unreasonable limitations on a public utility's liability to its customers. See *Danisco*, 267 Kan. at 767-68; *McNally Pittsburg Mfg. Corp. v. Western Union Telegraph Co.*, 186 Kan. 709, 714-15, 353 P.2d 199 (1960); *Milling Co. v. Postal Telegraph Co.*, 101 Kan. 307, 310, 166 P. 493 (1917).

With this background in mind, we turn to the substantive questions Heritage brought to us for review.

*Did the district court err in granting Evergy's motion for summary judgment?*

The primary issue driving Heritage's appeal is whether error occurred when the district court granted Evergy's request for summary judgment. The summary judgment standard is well known:

9

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, admissions on file, and supporting affidavits show that no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. The district court must resolve all facts and reasonable inferences drawn from the evidence in favor of the party against whom the ruling is sought. When opposing summary judgment, a party must produce evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issue in the case. Appellate courts apply the same rules and, where they find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment is inappropriate. Appellate review of the legal effect of undisputed facts is de novo." *GFTLenexa, LLC v. City of Lenexa*, 310 Kan. 976, 981-82, 453 P.3d 304 (2019).

Within this issue, Heritage advances a two-fold contention of error. First, it asserts that the district court missed the mark in finding that section 7.02(B) of Evergy's limited liability tariffs specifically justified constraints on the utility's liability under the facts presented here. It then claims the court compounded its error when it concluded that Heritage also failed to come forward with sufficient facts to justify submitting the matter to a jury to determine whether Evergy engaged in "wanton" conduct. We will address each aspect of its argument in turn.

### A. Whether limited liability provisions are enforceable

Section 7.02 in Evergy's tariff structure embodies the utility's limitations of liability and was relied on by both Evergy and the district court as a foundation for the assertion that summary judgment was appropriate given that the terms of the KCC tariff insulated the utility from liability for the property damage that occurred here.

Heritage first contends that the Legislature did not grant the KCC the latitude to insulate utilities from liability for their negligent conduct, and therefore, section 7.02 of Evergy's tariffs suffers from an unenforceability problem. Evergy counters that the

10

Legislature specifically vested the KCC with broad authority to regulate utility providers in whatever manner it deemed necessary to best serve the public interest, a latitude which necessarily includes eliminating common negligence claims against a utility.

Whether the KCC had authority to adopt the tariff's limitation of liability is a question of law over which this court exercises unlimited review. *Danisco*, 267 Kan. at 765. For their part, utilities have an obligation to only establish rates, regulations, and rules that are "just and reasonable." K.S.A. 66-101b. To the extent a utility strays from that requirement, a provision which is analyzed and determined to be "unjust or unreasonably discriminatory or unduly preferential" will be deemed void. K.S.A. 66-101b. The KCC enjoys investigatory powers through the operation of K.S.A. 66-101d, K.S.A. 66-101e, and K.S.A. 66-101f. If it acts under that authority and finds that a utility's rates violate the EPUA in any way, it has the legislatively established power to substitute the offending provision in a manner it determines to be "just, reasonable and necessary." K.S.A. 66-101f(a). Finally, through K.S.A. 66-101g, the Legislature specifically dictated that the provisions of the EPUA are to be liberally construed, and under K.S.A. 66-115, a tariff is assumed to be prima facie reasonable.

To determine whether the Legislature gave the KCC the authority to approve a liability limiting tariff which encompasses the extensive property damage Heritage suffered in this case, we can derive some guidance from our Supreme Court's opinion in *Danisco*, 267 Kan. at 767-68. Danisco Ingredients USA, Inc. (Danisco) was a Kansas based manufacturer of food additives and a customer of Kansas City Power & Light Company (KCP&L), which operated in both Missouri and Kansas. Danisco's production of food additives utilized a high vacuum process that could not tolerate "'even the briefest interruption of power.'" 267 Kan. at 762. Yet, it experienced three power outages in 1993 that caused disruptions to its production and resulted in economic damages. Danisco sued KCP&L in the hope of recovering its losses. The district court was called upon to interpret the following two liability limiting tariff provisions:

11

Rule 7.06, which addressed KCP&L's duty to supply continuous electrical energy to customers, and provided:

"'The Company will use reasonable diligence to supply continuous electric service to the customer but does not guarantee the supply of electric service against irregularities or interruptions. The Company shall not be considered in default of its service agreement with the customer and shall not otherwise be liable for any damages occasioned by any irregularity or interruption of electric service.'" 267 Kan. at 763.

Rule 7.12 purported to cover KCP&L's liability to its customers generally, and provided:

"'The Company shall not be considered in default of its service agreement and shall not be liable on account of any failure by the Company to perform any obligation if prevented from fulfilling such obligation by reason of any delivery delay, breakdown, or failure of or damage to facilities, an electric disturbance originating on or transmitted through electric systems with which the Company's system is interconnected, act of God or public enemy, strike or other labor disturbance involving the Company or the Customer, civil, military, or governmental authority, or any cause beyond the control of the Company.'" 267 Kan. at 763.

The district court concluded the provisions were unreasonable and unenforceable, prompting an appeal by KCP&L. In analyzing whether the Legislature granted the KCC the ability to limit a public utility's liability the *Danisco* court relied, in part, on *Milling Co.*, 101 Kan. 307. In that case, the court was tasked with determining whether a telegraph company could limit its liability for negligence. In so doing, it conducted an examination of the provisions governing public utilities and determined they did not explicitly authorize a limitation on liability. 101 Kan. at 310-11. However, the *Milling Co.* court did recognize that language contained within the public utilities act, which required that rules and regulations be reasonable and that rates be filed with the Commission, seemingly indicated a *narrow* right to such a limitation would be tolerated.

12

The court elaborated:

"It has been held in this state that a common carrier (without a permissive statute) cannot impose a condition exempting him from liability for his own negligence, and a telegraph company is so much like a carrier that its liability for negligence should be governed by similar principles, yet reasonable limitations of liability other than those which do not seek to excuse its gross negligence have been upheld; while stipulations restricting liability to an insignificant sum where the negligence was gross have been disregarded. [Citations omitted.]" 101 Kan. at 311.

The *Milling Co.* court went on to hold that "[a] telegraph company may make reasonable stipulations limiting its liability, but in the absence of positive or permissive statutes governing the subject, the reasonableness of any such stipulation is a question for judicial determination." 101 Kan. 307, Syl. ¶ 2. It ultimately found that the limitation at issue was unreasonable because it sought to constrain liability for negligence to an insignificant sum in all circumstances. 101 Kan. at 311.

Relying on the EPUA, *Milling Co.*, and other prior caselaw, the *Danisco* court concluded that while the EPUA does not explicitly confer power on either the public utility or the KCC to limit liability, Kansas nevertheless allows reasonable limitations as an integral part of the rate-making process. While the KCC is responsible for ensuring reasonable rates and assesses the propriety of liability limitations within the utility's filed tariff, it is the courts that will serve as the final arbiter over any questions concerning reasonability. 267 Kan. at 767-68.

But we note that *Danisco* is highly contextualized, and those details provide a critical distinction. Notably, it held that "[i]t was reasonable for the KCC to allow a tariff to become effective which relieved [KCP&L] of liability for damages resulting from its own ordinary negligence *in regard to the supply of electric service*." (Emphasis added.) 267 Kan. 760, Syl. ¶ 5. But the court went on to find that the approved limits on liability

13

at issue in KCP&L's tariff 7.12 went too far and, as a result, were inconsistent with Kansas law and public policy. 267 Kan. at 769, 773.

The consistent undercurrent in these analyses is that while liability limitations are enforceable in the abstract, a comprehensive assessment must be made with an eye toward what is "just and reasonable." See K.S.A. 66-101b. That reasonability touchstone leads us to the next aspect of Heritage's argument which is whether it can be said the particulars of the liability limitations set out under Evergy's tariff 7.02 are so unreasonable as to render them unenforceable. To resolve that inquiry, we must focus on the precise language of 7.02(A), (B), and (C).

### B. Interpretation of tariff 7.02, subsections (A), (B), and (C)

It is Heritage's position that the tariff was inapplicable under the facts of this case because subsection (A) of that provision is intended to solely address Evergy's duty to provide steady and continuous service, subsection (B) relates only to that harm or damage sustained by a customer during the course of Evergy's installation, maintenance, or replacement of equipment, and subsection (C) is limited to that harm or damage a non-customer suffered as a result of Evergy's installation, maintenance, or replacement of equipment on a customer's property.

Evergy counters that the language set forth under subsection (A) specifically encompasses *any* loss, damage, or injury *whatsoever* that is "'caused by or arising from Company's operations.'" It then proposes a rather broad interpretation of subsection (B) and argues it should be construed to cover not only operations, but also the provision of electric service, as well as the installation, maintenance, or replacement of lines or other facilities. Finally, Evergy refutes that subsection (C) has any application to non-customers, and instead argues that it simply contemplates the ordinary operations of the company and limits any liability for trespass, personal injury, and property damage that

14

may be caused by or related to such ordinary operations. In short, according to Evergy, all three subsections operate to shield it from liability for any property damage Heritage sustained by the collapse of its pole.

A determination of whether any of the three subsections may properly be construed to limit Evergy's liability to Heritage requires us to engage in an interpretation of the terms used in each. "Legally established tariffs are construed in the same manner as statutes." *Farmland Indus., Inc.*, 29 Kan. App. 2d at 1043. Interpretation of a statute is a question of law and is reviewed de novo. *Roe v. Phillips County Hospital*, 317 Kan. 1, 5, 522 P.3d 277 (2023). "The fundamental rule regarding statutory construction is that the intent of the legislature governs, where it can be ascertained. In construing statutes, the legislative intention is to be determined from a general consideration of the entire act. [Citation omitted.]" *Danisco*, 267 Kan. at 772.

As in *Danisco*, the tariffs filed and approved here are the product of input from the utility company (Evergy) and the approval process of the KCC. "Thus, in construing the tariffs in question, consideration must be given to both the role and intent of the KCC in the process of approval and the intent of all participants, including the customers of [the utility]." 267 Kan. at 772-73. When construing tariffs to determine intent, appellate courts must consider the various provisions *in pari materia* with a view of reconciling and bringing the provisions into workable harmony if possible. *Roe*, 317 Kan. at 5-6. Tariff schedules are to be construed as a whole, including footnotes, from the ordinary meaning of the words used. *Grindsted*, 262 Kan. at 310.

While it is the KCC's responsibility to ensure reasonable rates and determine the propriety of liability limitations within approved tariffs, it is ultimately our responsibility to decide whether a duly filed and approved tariff purporting to limit a public utility's liability is reasonable. *Danisco*, 267 Kan. at 768. The interpretation that emerges should also be consistent with the purpose of the tariff so as to avoid absurd results. *City of*

*Wichita v. Trotter*, 316 Kan. 310, 318, 514 P.3d 1050 (2022); *Grindsted*, 262 Kan. at 310. Finally, in our endeavor to exact clarity from each of the individual subsections, we must remain mindful of the rule that "the plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997); see also *State v. Strong*, 317 Kan. 197, 203, 527 P.3d 548 (2023); *O'Donoghue v. Farm Bureau Mut. Ins. Co*., 275 Kan. 430, 433, 66 P.3d 822 (2003) (in construing statutes, courts should construe words and phrases according to context and approved use of language).

All three of the subsections at issue make up the entirety of tariff 7.02 which is entitled "Limitation of Liability." But a careful reading reveals that, as Heritage correctly notes, the limitations allowed under each are triggered by three decidedly different circumstances. That is, they are tailored to their individual contexts as a result of the language specifically chosen by Evergy during the drafting phase. While Evergy has consistently taken the stance that all three are applicable in this case and each one exempts it from liability, we find such an interpretation would result in unreasonable and inexplicable redundancy and thereby cannot abide their view. Rather, our analysis of those provisions, with an eye toward the principles governing interpretation set out above, and the obligations attendant to those principles in this context, leads us to conclude that sections 7.02(A) and (C), when read individually and in harmony with one another, do not serve to limit Evergy's liability to Heritage. Those two subsections are only applicable in wholly distinguishable contexts than what we are faced with here. We agree that subsection (B) can be read to embrace the property damage arising out of the fire because the language of that provision is so broad and sweeping it essentially encompasses all conceivable facts under which harm or damage may arise. For reasons explained below, tariffs of that nature are unreasonable and rejected as void. Accordingly, the district court's contrary finding and grant of summary judgment to

16

Evergy were erroneous. The path we took to arrive at this conclusion is illustrated by the following meticulous analysis.

Subsection 7.02(A) of the tariff states:

"Company shall use commercially reasonable efforts to supply steady and continuous Electric Service at the Point of Delivery. Company shall not be liable to customer for any loss, damage or injury whatsoever caused by or arising from Company's operations including loss, damage or injury occasioned by irregularities of or interruptions in Electric Service, leakage, escape or loss of electric energy after same has passed the Point of Delivery or for any other cause unless it shall affirmatively appear that the injury to persons or damage to property complained of has been caused by Company's willful or wanton conduct. In no event shall Company be liable for any loss, damage or injury caused by any defects in customer's wiring or appliances."

Section 1 for Evergy's full complement of tariffs is devoted to definitions for a portion of the various terms used throughout the document. That section is beneficial given that, again, the tariffs are drafted by Evergy and not every reader attempting to decipher the provisions is fluent in the vernacular from which those terms of art arise.

The first phrase in subsection (A) states that Evergy shall "supply steady and continuous Electric Service at the Point of Delivery." Tariffs 1.03 and 1.08 clarify that "Electric Service" and "Point of Delivery" should, respectively, be understood to mean the following:

"'Electric Service' means the availability of electric power and energy supplied by Company at a point of delivery within Company's Service Territory on or near the customer's premises, at approximately the standard voltage and frequency for a class of service made available by Company in that area, which source is adequate to meet customer's requirements, irrespective of whether or not the customer makes use of such Electric Service."

"'Point of Delivery' means the place where Company's wires are joined to customer's wires or apparatus unless some other Point of Delivery is specified in the Service Agreement."

Tariff 7.01(A) sheds additional light and explains that for purposes of "Supplying Electric Service" the "Company shall supply Electric Service . . . at Points of Delivery, which are adjacent to facilities of Company adequate to and suitable for the Electric Service desired by Customer."

When performing exercises in statutory interpretation, ordinary terms should be assigned ordinary meanings. See *Greer v. Eby*, 309 Kan. 182, 192-93, 432 P.3d 1001 (2019). In that respect, a dictionary is useful in teasing out the underlying meaning of this first phrase in 7.02(A). According to Webster's, "steady" means "constant, regular, uniform, or continuous; not changing, wavering, or faltering." Webster's New World College Dictionary 1420 (5th ed. 2018). Similarly, "continuous" is defined as "going on or extending without interruption or break." Webster's New World College Dictionary 322 (5th ed. 2018). From this collective terminology, we can deduce that this subsection was drafted to address Evergy's obligation to provide stable, uninterrupted electrical power and energy to its customers at their electrical inlets.

Turning to the second sentence, we note that the focus shifts from the act Evergy is obligated to perform to the protections it is afforded when injury or harm occurs *during* its provision of that electrical service. Heritage contends that the plain language communicates that the limitations of liability in subsection (A) "all logically relate to the corresponding duty imposed on [Evergy] to provide steady and continuous service." We agree. This single sentence is a tad unwieldly, but we have isolated the language below and will endeavor to break it down to explain the reasoning behind our decision.

"Company shall not be liable to customer for any loss, damage, or injury whatsoever caused by or arising from Company's operations, including loss, damage or injury,

18

occasioned by irregularities of or interruptions in Electric Service, leakage, escape or loss of electric energy after same has passed the Point of Delivery or for any other cause unless it shall affirmatively appear that the injury to persons or damage to property complained of has been caused by Company's willful or wanton conduct."

First, we note that this sentence immediately follows the identification of the specific service Evergy is obligated to provide—"to supply steady and continuous Electric Service at the Point of Delivery." Accordingly, we are satisfied that references to any damage or harm arising out of the "Company's operations" pertain to the conduct addressed by the sentence which immediately precedes it. That is, it intends to encompass, and is thereby limited to, any harm emanating from the Company's supply of electric service.

This conclusion is then buttressed by the choice of terms that follow the reference to those "operations," all of which describe a different manner of disruption to electric service. For example, "irregular" is defined as: "not conforming to established rule, method, usage, standard, etc.; out of the ordinary; anomalous." Webster's New World College Dictionary 769 (5th ed. 2018). "Interruption" is understood to mean "an interrupting or being interrupted"; interrupt is defined as "to make a break in the continuity of; cut off; obstruct." Webster's New World College Dictionary 761 (5th ed. 2018). "Leakage" means "an act or instance of leaking; leak" and "leak" is defined as "a loss of electrical current though faulty insulation." Webster's New World College Dictionary 828 (5th ed. 2018). Finally, "escape" is "an outward flow or leakage." Webster's New World College Dictionary 495 (5th ed. 2018).

Evergy argues that an analysis of this nature breaks down in the face of the phrase "or for any other cause," and cites *Sierra Club v. Moser*, 298 Kan. 22, 53, 310 P.3d 360 (2013), for the proposition that the word "any" must receive an "expansive reading." But Evergy's position cannot overcome the hurdles erected by principles of statutory construction. Most notably, that "'[t]o determine a statute's plain meaning, we not only

19

look to the language itself, but also the specific context in which that language is used, and the broader context of the statute as a whole.'" *Bruce v. Kelly*, 316 Kan. 218, 224, 514 P.3d 1007 (2022) (citing *Othi v. Holder*, 734 F.3d 259, 265 [4th Cir. 2013]). In addition, "[w]ords are to be given the meaning that proper grammar and usage would assign them." Scalia & Garner, *Reading Law: The Interpretation of Legal Texts*, at 140 (2012).

It is without question that the immediate context here is the supply of electric service, which we know from Evergy's own table of definitions to mean its obligation to provide stable, uninterrupted electrical power and energy to its customers at their electrical inlets. Accordingly, the global insulation from liability Evergy attempts to attach to the phrase "or for any other cause" is inconsistent not only with the language surrounding it in the same sentence, but also with the subsection as a whole. Its position also falters in the face of the *ejusdem generis* rule. That rule is frequently triggered when statutes provide a list of specific items followed by a general catch-all phrase which is often introduced by the words "or other." Generally, the phrase may be construed to be limited to things "of the same kind" (*ejusdem generis*) as the specific items which it follows. 1 Subst. Crim. L. § 2.2(h) (3d ed.); see also *Rockers v. Kansas Turnpike Authority*, 268 Kan. 110, 115, 991 P.2d 889 (1999) (where a more general word or phrase follows the enumeration of specific things, the general word or phrase is typically understood to refer to things of the same kind or within the same classification as the specific terms).

In *McBoyle v. United States*, 283 U.S. 25, 51 S. Ct. 340, 75 L. Ed. 816 (1931), McBoyle flew an airplane, he knew to be stolen, from one state to another and was later convicted under a federal statute that made it a felony to transport in interstate commerce an "automobile, automobile truck, automobile wagon, motor cycle, or any other self-propelled vehicle not designed for running on rails" which the driver or operator knows to be stolen. The United States Supreme Court ultimately held that an airplane was not covered by the quoted phrase finding that "other self-propelled vehicles" was limited to

20

land vehicles, consistent with the theme of the other specific objects listed. 283 U.S. at 26-27. Similarly, in *Yates v. United States*, 574 U.S. 528, 135 S. Ct. 1074, 191 L. Ed. 2d 64 (2015) (plurality opinion), Yates was convicted of knowingly disposing of undersized fish in order to prevent the government from taking lawful custody and control of them, and violating the Sarbanes-Oxley Act by destroying or concealing a tangible object with the intent to impede, obstruct, or influence the government's investigation into harvesting undersized grouper. The United States Supreme Court later held that Yates could not be convicted under the statute which prescribed the concealing or falsifying of "any record, document, or tangible object," because if Congress had truly intended "tangible object" to be interpreted so broadly as to encompass objects as dissimilar as documents and fish, it would have had no reason to refer specifically to "record" or "document." 574 U.S. at 546.

As a final example, in *R.P. v. First Student Inc*., 62 Kan. App. 2d 371, 515 P.3d 283 (2022), a panel of this court undertook an analysis of the definition of "municipality" found at K.S.A. 75-6102(b). It observed that the definition includes two specific enumerations followed by more general phrases, similar to what we face here. The first of the more precise lists included "any county, township, city, school district," and was followed by the more general phrase "or other political or taxing subdivision of the state." The second specific enumeration read, "or any agency, authority, institution," which was then followed by the more general phrase "or other instrumentality thereof." Applying the *ejusdem generis* rule, the panel interpreted the general phrase "any agency, authority, institution or other instrumentality thereof" to fall within the same classification as "any county, township, city, school district or other political or taxing subdivision of the state." It then concluded the more general phrase "other instrumentality thereof" meant something within the same classification as "any agency, authority, [or] institution," and noted that each specifically enumerated entity in K.S.A. 75-6102(b) was reflective of either a larger governmental entity or a body organized by a governmental entity to perform a government function. 62 Kan. App. 2d at 376-77.

21

The same principle influences our decision here. The enumeration of specific types of electrical supply failure indicates that the phrase "or for any other cause" is meant to cover only that harm or damage which occurs specifically during the course of supplying electrical energy to a customer's inlets, rather than any possible harm which may manifest as a result of any conceivable malfeasance Evergy may commit as a utility provider. See *Commissioner of Internal Rev. National Carbide Corp.*, 167 F.2d 304, 306 (2d Cir. 1948) ("words are chameleons, which reflect the color of their environment"). If it were otherwise, there would be no need to include the list "irregularities of or interruptions in Electric Service, leakage, escape or loss of electric energy after the same has passed the Point of Delivery." Our interpretation gives voice to the fundamental rule of statutory construction that the purpose and intent of the drafting body govern the outcome. As explained in *Adamson v. WorldCom Communications, Inc.*, 190 Or. App. 215, 222, 78 P.3d 577 (2003):

> "[T]he effect of a tariff on a particular claim depends on the nature of the claim and the specific terms of the tariff. If the claim is one that implicates the provisions of a tariff, then the tariff controls according to its terms, which may either limit relief available or bar a claim entirely. But if the claim is unrelated to the tariff, then the claim is not limited or barred. In other words, merely because a tariff exists does not necessarily mean that a claim is barred."

The collapse of a 50-year-old deteriorated pole which in turn triggered a fire resulting in several million dollars in damage to a business is well outside the scope of the harm or damage contemplated under subsection (A) of section 7.02. Accordingly, that provision does not insulate Evergy from liability for the significant loss Heritage suffered.

Subsection 7.02(B) of the tariff states:

"Customer shall save Company harmless from all claims for trespass, injury to persons and damage to lawns, trees, shrubs, buildings or other property that may be caused by reason of or related to Company's operations, the provision of Electric Service hereunder and the installation, maintenance or replacement of Company's service lines or other facilities necessary to serve customer, unless it shall affirmatively appear that the injury to persons or damage to property complained of has been caused by Company's willful or wanton conduct."

Within this subsection, the tariff outlines that Evergy is not liable for "*all claims* for trespass, injury to persons and damage to lawns, trees, shrubs, buildings or other property that may be caused by reason of or related to [Evergy's] operations" unless "the injury to persons or damage to property complained of has been caused by [Evergy's] willful or wanton conduct." (Emphasis added.) Here, the property damage was caused by "reason of or related to" Evergy's operations—its pole, which was a component in delivering electrical services to customers, fell on Heritage's building which caused the fire. Under subsection 7.02(B), unless the harm complained of was the result of Evergy's willful or wanton conduct, Evergy is not liable for the damage to the property. Candidly, it is difficult to envision an instance that would not be swept up within the vast scope of this provision. Its language is exceedingly broad and all-encompassing. Thus, facially it applies to the situation before us.

Finally, 7.02 subsection (C) of the tariff states:

"In accordance with its normal work procedures, Company shall exercise reasonable care when installing, maintaining and replacing Company's facilities located on customer's premises. However, beyond such normal procedures, Company assumes no responsibility for trespass, injury to persons or damage to lawns, trees, shrubs, buildings or other property that may be caused by reason of or related to Company's operations, the provision of Electric Service hereunder or the installation, maintenance or replacement of Company's facilities to serve customer, unless it shall be shown affirmatively that the

23

injury to persons or damage to property complained of has been caused by Company's willful or wanton conduct."

At the hearing on its summary judgment motion, Evergy took the position that this subsection was the most on point here. As an initial matter, the tariff indicates that Evergy vows to exercise "reasonable care" while performing specifically enumerated tasks, i.e., "installing, maintaining and replacing Company's facilities," during the course of "normal" work procedures. Or stated another way, to exercise reasonable care when undertaking efforts related to the utility which conform to a standard or regular pattern: characterized by that which is considered usual, typical, or routine. Normal: "conforming with or constituting an accepted standard, model, or pattern . . . natural; usual; standard; regular." Webster's New World College Dictionary 998 (5th ed. 2018). In the second sentence of the subsection there is a pivot in the subject matter to now address limitations on liability. There is an associated shift in the language away from the aforementioned "normal procedures" to focus on that which is "beyond such normal procedures." That is, the language used indicates that Evergy is insulated from liability from any harm occurring outside the scope of "such normal procedures." In our view, that alteration in the language signals that the utility will not be liable for any damage resulting from the performance of those same specifically enumerated tasks—"installing, maintaining and replacing Company's facilities," or provision of its electric service under "unusual," "extraordinary" or "exceptional" circumstances. Merriam-Webster Online Dictionary, http://www.merriam-webster.com/thesauraus/normal.

The review of a statute to ascertain its intent begins with the plain language used therein, giving common words their ordinary meaning, and when that plain language is clear and unambiguous a court refrains from reading something into the provision that is not readily found in its words. *Austin Properties v. City of Shawnee, Kansas*, 64 Kan. App. 2d 166, 174, 547 P.3d 531 (2024). We also have a responsibility to give reasonable, rational, sensible, and intelligent constructions to tariffs whenever possible. See

24

*Mendenhall v. Roberts*, 17 Kan. App. 2d 34, 42, 831 P.2d 568 (1992). Where this subsection contemplates damage arising out of *affirmative acts* undertaken by the company, i.e., "installing, maintaining and replacing Company's facilities" and "the provision of Electric Service" when addressing the circumstances in which the company's liability is limited, it is neither sensible nor reasonable to construe the language of this provision to also encompass the *failure to act*, or Evergy's refusal to inspect and maintain its poles, as falling within that limitation on its liability. Moreover, Evergy consistently turned a blind eye to the pole for decades, not simply during circumstances that were "beyond such normal [work] procedures" as required to fall within the parameters of the limited liability portion of this provision. Thus, we decline to find that subsection (C) of tariff 7.02 insulates Evergy from liability for the extensive damage that Heritage endured when the rotted pole finally gave way and collapsed. See *Adamson*, 190 Or. App. at 222.

### C. *Whether the limitation of liability articulated under subsection (B) must be rejected as a violation of fundamental notions of reasonability*

While we have determined that subsection (B) of tariff 7.02, on its face, is seemingly applicable here, our inquiry does not end there. Rather, Heritage requests that we take our analysis one step further and resolve whether the limitation on liability set out in the subsection is unenforceable because the extent of its reach is unreasonable as a matter of law and violates public policy. It asserts that we can use *Danisco* as a guide to arrive at a finding that the limitation is too extreme because it essentially serves to indemnify Evergy against all conceivable negligence claims unless their conduct is wanton; a limitation that is neither inherent to nor justified by the rate-making process.

Evergy counters that the conclusion Heritage advocates for arises out of a significantly more conservative reading of *Danisco* than what was intended by the Kansas Supreme Court when drafting the opinion and, when that authority is afforded the court's intended interpretation, it reflects that the reach of subsection (B) is reasonable.

25

According to Evergy, a contrary finding will result in future damage awards that threaten to jeopardize the financial stability of the utility or be absorbed by the rate payers.

We reiterate our awareness of the fact that "reasonable rates are dependent in no small measure on rules limiting liability, for the broader the liability exposure, the greater the cost of electric service." *Danisco*, 267 Kan. at 773 (citing *Waters v. Pacific Telephone Co.*, 12 Cal. 3d 1, 7, 114 Cal. Rptr. 753, 523 P.2d 1161 [1974]). Whether that reasonability requirement is satisfied, which in turn allows for the enforceability of the tariff, is a question left for the courts to decide and is one over which we exercise unlimited review. See *McNally Pittsburg Mfg. Corp.*, 186 Kan. at 715 (The courts are the final arbiter of the reasonableness of a limitation of liability within a duly approved tariff.).

In one of the earliest relevant cases in our state, *Russell v. Telegraph Co.*, 57 Kan. 230, 45 P. 598 (1896), Russell brought an action against Western Union to recover various damages he sustained as a result of the telegraph company's failure to promptly deliver a message to him. Our Supreme Court found that it is unreasonable for a common carrier to attempt to limit its own liability but could nevertheless reasonably demand that such claims for negligence be brought within 60 days. 57 Kan. at 233-34.

That theme carried over to 1917 and *Milling Co.* In that case, the Kansas Supreme Court recognized that a utility's ability to limit its liability was "a proper element of consideration in rate making" because "[i]f a higher degree of responsibility attaches to the service, a greater rate must be exacted." 101 Kan. at 311. There, the court found the tariff that constrained the telegraph's liability for ordinary negligence limited recovery to the fee of the missent telegraph. But according to the court, such a limitation of the utility's liability was unreasonable given the magnitude of "the annoyance, delay, business inconvenience, and financial damage" borne of "a telegraph company's failure to perform its self-assumed public service." 101 Kan. at 311. The returned fee was roughly

26

25 or 40 cents whereas the actual damage arising from the missent telegraph was approximately $265. Thus, the court determined it is unreasonable for a company to limit its liability for negligence to an insignificant sum in virtually all circumstances. 101 Kan. at 311.

We must now return to *Danisco* as it is a key authority in guiding the analysis of this case. The provisions at issue in that case limited KCP&L's liability relating to the continuous supply of electric services, and the court was tasked with determining whether those provisions were "reasonable and enforceable as a matter of law and public policy." *Danisco*, 267 Kan. at 765. When determining if those limitations were reasonable, the court reiterated that the "[t]he theory underlying the enforcement of liability limitations is that because a public utility is strictly regulated its liability should be defined and limited so that it may be able to provide service at reasonable rates." 267 Kan. at 769. This theory is supported by the notion that "'[a] broadened liability exposure must inevitably raise the cost and thereby the rates, of electric service.'" 267 Kan. at 769 (quoting *Landrum v. Florida Power & Light Co.*, 505 So. 2d 552, 554 [Fla. Dist. App. 1987]). The *Danisco* court observed that other jurisdictions addressing a similar question have found that it is reasonable to allow some limitation on liability for ordinary negligence in connection with the delivery of electric services. 267 Kan. at 769, 771; see *Landrum*, 505 So. 2d at 554 (delivery of electric services); *Computer Tool & Engineering v. NSP*, 453 N.W.2d 569, 573 (Minn. App. 1990) (delivery of electric services); *Lee v. Consolidated Edison*, 98 Misc. 2d 304, 306, 413 N.Y.S.2d 826 (1978) (delivery of electric services).

Ultimately, the *Danisco* court determined it was reasonable for KCP&L to enjoy a measure of insulation from liability for those damages resulting from its own simple negligence "*in regard to the supply of electrical service*," but tariffs which attempt to relieve a utility of liability for damages from its wanton or willful conduct are unreasonable. (Emphasis added.) 267 Kan. at 772. However, that is a distinctly different question than the one we have been asked to resolve—whether it is reasonable for a

27

utility to enjoy a limitation of its liability when property damage occurs due to an avoidable failure of the utility company's equipment. Stated in broader terms, is a utility's limitation of liability for property damage flowing from the company's ordinary negligence reasonable?

In *Szeto v. Arizona Public Service Company*, 252 Ariz. 378, 503 P.3d 829 (Ariz. Ct. App. 2021), a fire destroyed two homes, one of which was owned by the Szetos. A fire investigator subsequently determined that arcing in the overhead electrical wires on the utility pole between the two homes caused the fire. The Szetos pursued a cause of action against the Arizona Public Service Company (APS) and asserted that the negligent manner in which the company maintained the power lines gave rise to the fire. APS moved for summary judgment on the grounds that it was exempted from liability for ordinary negligence by its public utility tariff, which stated, in relevant part:

> "'5.3 Service Interruptions:  Limitations on Liability of Company
>
> "'5.3.1 Company shall not be liable to the customer for any damages occasioned by Load Serving ESP's equipment or failure to perform, fluctuations, interruptions or curtailment of electric service, except where due to Company's willful misconduct or gross negligence. Company may, without incurring any liability therefore, suspend the customer's electric service for periods reasonably required to permit Company to accomplish repairs to or changes in any of Company's facilities. The customer needs to protect their own sensitive equipment from harm caused by variations or interruptions in power supply.'" 252 Ariz. at 381.

The trial court granted APS's motion upon finding that the phrase "failure to perform" indicated that the utility company could only be held liable for the commission of willful misconduct or gross negligence. *Szeto*, 252 Ariz. at 381.

The Szetos sought review from the Arizona Court of Appeals and obtained a reversal back to the lower court. The appellate court rationalized that while limitations on

28

a utility's liability for economic damages resulting from service interruptions are appropriately considered in rate-making decisions because of their contractual nature and far-reaching effects, no such policy consideration supports eliminating liability when a public utility's negligence causes property damage or a personal injury arising out of a fire caused by a utility's negligence in maintaining its electrical service lines. Thus, where the latter do not meet the justification to fall within the protected sphere, limiting a utility's liability for such incidents is not appropriate. 252 Ariz. at 382-83.

We likewise find *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 809 N.E.2d 1248 (2004), beneficial to our analysis. In that case, Janice Adams' house exploded and caused her death shortly after she returned home and stepped inside. An investigation revealed that the cause of the explosion and corresponding fire was the failure of the flexible connector between Adams' kitchen range and the gas supply which allowed a significant amount of natural gas to escape and accumulate in the home. When Adams entered the house and flipped on an electric light it generated a small spark that in turn ignited the gas.

Janice's daughter, Christy Adams, brought a wrongful-death action against NI-Gas. She alleged that the utility company was aware that Cobra brand natural gas appliance connectors were defective and prone to failure resulting in natural gas leaks and explosions. She asserted that NI-Gas had a duty to warn its customers about the dangers associated with those particular connectors and that it breached this duty. NI-Gas moved for summary judgment and its motion was granted.

The Illinois Court of Appeals ultimately reversed the summary judgment order upon finding that, as a matter of law, "'a utility company that has actual knowledge of a dangerous condition associated with the use of its product has a responsibility to its customers to warn them of that danger.'" 211 Ill. 2d at 42 (quoting *Adams v. Northern*

29

*Illinois Gas Co*., 333 Ill. App. 3d 215, 224, 774 N.E.2d 850 [2002]). NI-Gas petitioned for and was granted review by the Illinois Supreme Court.

At the outset, the Illinois Supreme Court observed that a tariff provision such as the one at issue "provides the source for, and determines the nature and extent of, a public utility's service obligations to its customers." *Adams*, 211 Ill. 2d at 57 (citing *Illinois Bell Switching Station*, 161 Ill. 2d 233, 248, 641 N.E.2d 440 [1994] [Miller, J. concurring]). Thus, to the extent the claim implicates the provisions of a tariff, then the tariff controls according to its terms, which may either limit relief or bar a claim entirely. But if the claim is unrelated to the tariff, then the claim will not be either limited or precluded. Stated another way, the mere existence of a tariff will not serve to bar a claim. 211 Ill. 2d at 58 (quoting *Adamson*, 190 Or. App. at 222). Nor is the tariff "'a shield against all actions based in state law.'" 211 Ill. 2d at 58 (quoting *American Telephone and Telegraph Co. v. Central Office Telephone, Inc.*, 524 U.S. 214, 230-31, 118 S. Ct. 1956, 141 L. Ed. 2d 222 [1998] [Rehnquist, C.J., concurring]).

The court went on to note that Illinois courts have long applied common-law principles to defendant utilities subsequent to the 1921 enactment of the Public Utilities Act, despite the existence of tariffs filed with the Illinois Commerce Commission, because where the tariff does not address a particular situation, the common law is triggered, and its corresponding duty analysis must be applied. *Adams*, 211 Ill. 2d at 61-62 (citing *Metz v. Central Illinois Electric and Gas Co.*, 32 Ill. 2d 446, 207 N.E.2d 305 [1965]); *Clare v. Bond County Gas Co.*, 356 Ill. 241, 190 N.E. 278 [1934]). The *Adams* court concluded that NI-Gas owed a duty to Adams and rejected NI-Gas' contention that its tariff provision absolved it from any duty associated with a customer's equipment even in those instances where it is aware of a leak or some other factor that renders the transportation of gas unsafe. 211 Ill. 2d at 63. In so doing, the court hearkened back to its obligation to adhere to principles of statutory construction. Specifically, its duty to

30

presume that the legislature did not intend absurdity or injustice, and that a statute or ordinance must receive a sensible construction. 211 Ill. 2d at 64-65.

Applying those principles to the tariff provision, in conjunction with the rule that exculpatory language contained within a tariff is to be strictly construed against the public utility and in favor of the customer, the court concluded that the Commission did not intend to completely immunize NI-Gas with respect to a gas leak of which it had notice. *Adams*, 211 Ill. 2d at 64-65. Rather, it is "entirely appropriate" that a public utility bear responsibility for personal injury or property damage which arises out of its own negligence and there is no general policy that allows a commission to grant limitations for such damages. 211 Ill. 2d at 68; see also *State Farm Fire & Cas. Co. v. Southern Bell Tel. & Tel. Co.*, 245 Ga. 5, 7, 262 S.E.2d 895 (1980) (holding tariff limiting a general claim for failure to provide telephone service does not preclude a state claim arising out of the utility's alleged negligence); *Computer Tool & Engineering, Inc. v. Northern States Power Co.*, 453 N.W.2d 569, 573 (Minn. App. 1990) (holding tariff is narrow and only applies to exonerate the utility from liability occasioned by interruptions in electric service; liability remains for all injuries not attributable to power disruptions); *Public Service Com'n v. Mo. Gas Energy*, 388 S.W.3d 221, 231-32 (Mo. App. 2012) (holding limitations of liability involving economic damages are the types involved when establishing a utility's rates, but the same cannot be said of limitations of liability in a negligence action involving property damage); *Olson v. Pacific Northwest Bell Telephone Co.*, 65 Or. App. 422, 426, 671 P.2d 1185 (1983) ("Assuming, arguendo, that the extent of defendant's liability may be limited reasonably by tariffs or regulations, we do not agree that this tariff insulates defendant from all liability under other theories."); *Kroger Co. v. Appalachian Power Co.*, 244 Va. 560, 563, 422 S.E.2d 757 (1992) (interpreting utility tariff and noting it would not shield company from "all liability in providing power to a customer beyond the delivery point"); *O'Neill v. Connecticut Light & Power Co.*, No. HHDCV186089044S, 2020 WL 1889124, at *11 (Conn. Super. 2020)

(unpublished opinion) (holding tariff unenforceable against claims of ordinary negligence because no authority set out in statute to limit liability in tariffs).

Returning to the matter at hand, again, the occurrence under scrutiny involves the collapse of a 50-year-old wooden pole with only three years remaining on its average lifespan at the time it buckled, which sparked a fire and caused several millions of dollars in damage to Heritage's business. Testimony regarding industry inspection standards provided evidence that poles of this nature should be inspected on a 10-year cycle. But there was no evidence to indicate the pole was ever inspected at any point during its entire existence. Investigation of the pole that was undertaken after the fire revealed evidence of advanced wood decay throughout the entire cross-section of the pole.

The trial court granted Evergy's request for summary judgment upon finding that the nature of the facts presented here were of the type contemplated when the tariff addressing limitations on liability, specifically subsection 7.02(B), was drafted. To reiterate, that section states the following:

> "Customer shall save Company harmless from all claims for trespass, injury to persons and damage to lawns, trees, shrubs, buildings or other property that may be caused by reason of or related to Company's operations, the provision of Electric Service hereunder and the installation, maintenance or replacement of Company's service lines or other facilities necessary to serve customer, unless it shall affirmatively appear that the injury to persons or damage to property complained of has been caused by Company's willful or wanton conduct."

We recognize that a limitation on liability reflected in tariffs enables utilities to offer lower rates to their customers. And admittedly, the tariff environment boasts some rather unforgiving terrain. For example, a carrier must charge the filed tariff rate even if it has quoted its customer a lower rate upon which the customer relied in entering into the contract. See *Marco Supply Co. v. AT & T Communications*, 875 F.2d 434, 436 (4th Cir.

1989). Thus, "[n]either the customer's ignorance nor the utility's misquotation of the applicable tariff provides refuge from the tariff or alters the tariff's terms." *Southwestern Bell Telephone Co. v. Metro-Link Telecom, Inc.*, 919 S.W.2d 687, 693 (Tex. App. 1996). But a common thread is detectable in the aforementioned cases that prompted a finding in favor of liability: while notions of public policy favor limitations on liability for damages arising out of service interruptions due to their far-reaching effects, those policy considerations do not equally align with eliminating liability when the negligent acts of a public utility result in isolated incidents of property damage. This is the same mindset exhibited by the Supreme Court of the United States in *Central Office Telephone* when it stated that "[i]n order for the filed rate doctrine to serve its purpose, therefore, it need pre-empt only those suits that seek to alter the terms and conditions provided for in the tariff." 524 U.S. at 229. Inherent in these rulings is the lack of an intention to award public utilities complete immunity such as what Evergy seeks here.

Even in those states where the limitation of liability is more broadly permitted, the boundary for reasonableness stops short of a complete absolution of liability. For example, the Texas Supreme Court has rationalized that liability for ordinary negligence can be limited to some degree in a utility company's tariff because "a limitation on liability is an inherent part of the rate the utility charges for its services." *Southern Elec. Power Co. v. Grant*, 73 S.W.3d 211, 217 (Tex. 2002). There, an electric utility customer sued the utility provider for negligence, seeking damages for personal injuries and property damage, due to an electrical power fluctuation in her home. The district court entered summary judgment in favor of the utility, holding that the tariff absolved the company from liability, and the customer appealed. There, the tariff read:

> "'The Company shall not be liable for damages occasioned by interruption, failure to commence delivery, or voltage, wave form, or frequency fluctuation caused by interruption or failure of service or delay in commencing service due to accident to or breakdown of plant, lines, or equipment, strike, riot, act of God, order of any court or judge granted in any bonafide adverse legal proceedings or action or any order of any

33

commission or tribunal having jurisdiction; *or, without limitation by the preceding enumeration, any other act or things due to causes beyond its control, to the negligence of the Company, its employees, or contractors, except to the extent that the damages are occasioned by the gross negligence or willful misconduct of the Company*."' 73 S.W.3d at 214-15.

The Texas Supreme Court determined that the utility's "tariff provision limiting its personal-injury liability is reasonable" because "it does not purport to relieve [the company] from liability under all conceivable circumstances." 73 S.W.3d at 220. That is, it specifically conditioned its approval of the tariff on the basis that it did not attempt to shield the utility from the consequences of its negligent conduct in all situations.

It is difficult to capture the point more clearly, or eloquently, than our Supreme Court did in *Wilson* several decades ago:

"'In accordance with the general doctrines as to the duties and liabilities of persons making use of instrumentalities apt to injure others, it has been held that where one accumulates and gets possession of a quantity of electricity and attempts to use it, he must take care of it and see that it does not do damage to persons or property. . . . According to a number of American authorities, while those engaged in generating and distributing electricity may be held to a high degree of care for the protection of those liable to come in contact with this dangerous and subtle force, nevertheless the liability of electric companies, telephone companies, and others transmitting or using electricity for damage or injury, is governed, not by the principles of insurance of safety, or of contracts, but, as in the case of unintended damage or injury generally, by the simple rules of the law of negligence. Such companies or persons are not commonly regarded as insurers against injury. *The obligation of electric companies to exercise proper care is not determined by their right to construct and maintain their lines, but rests upon their duty to protect others while in the lawful exercise of their rights.* With the advance of civilization, electricity has become a necessity, and in order to make it useful to man it must be carried from place to place. The restrictions governing the handling of this commodity by public or private corporations or by individuals must, in view of its commercial and domestic importance, be reasonable, although the expense of what may

34

be necessary to prevent injury to others is not an absolute defense to actions for injury for failure to take the necessary precautions.'" (Emphasis added.) *Wilson v. Kansas Power & Light Co.*, 232 Kan. 506, 511-12, 657 P.2d 546 (1983) (quoting 26 Am. Jur. 2d, Electricity, Gas, and Steam § 39, pp. 245-47).

Electricity is an extraordinarily dangerous commodity, as evidenced by the catastrophic facts of this case. Thus, where the touchstone for this matter must be reasonableness, we are persuaded that the limits of liability expressed in 7.02(B) are a clear reflection of Evergy's desire to insulate itself from liability under any conceivable circumstance, a stance which goes too far and runs contrary to Kansas law and public policy. See K.S.A. 66-101b (granting the KCC the authority "to make just and reasonable rules, classifications and regulations"). In construing the provision, we must presume that neither absurdity nor injustice were intended; nevertheless, that is the outcome the plain language demands. A tariff provision drafted so broadly as to insulate a public utility from liability for every conceivable act of misfeasance, including ordinary negligence which results in catastrophic property damage, is unreasonable and unenforceable.

At a very fundamental level, what is evident from the tariff structure is that under provision 7.07, Evergy purports to assure its customers that it will provide the necessary "[m]aintenance, Replacement, and Emergency Repairs of Company's Facilities" as required, yet under 7.02(B) it eliminates any recourse a customer might have for Evergy's failure to adhere to that express obligation. Thus, what the tariff giveth, it also taketh away. If we were analyzing this through the lens of a contract, such an internal inconsistency as it exists in the tariff structure would be tantamount to an illusory promise. Again, consideration must be given to both the role and intent of the KCC in the process of approval and the intent of *all* participants, including the utility's customers. *Danisco*, 267 Kan. at 772-73. Here, Evergy seeks to surreptitiously excise the interests of its customers through the operation of its tariff structure. Accordingly, the district court erred in applying the limitations of liability found under 7.02(B) in Evergy's tariff as a shield from liability for the utility's allegedly negligent conduct when granting summary

35

judgment. That subsection is unlawful and unreasonable and sets forth a grant of immunity that was well beyond the KCC's delegated authority. Therefore, that portion of the tariff is void.

The removal of that subsection from the tariff eliminates the foundation underlying the district court's award of summary judgment to Evergy. Accordingly, we reverse the decision of the district court and remand the case with directions to begin litigation anew to afford Heritage a full and fair opportunity to establish whether the calamitous damage it suffered was the product of Evergy's ordinary negligence.

### D. Is the authority of the KCC to limit liability of public utilities an unlawful abrogation of common law?

Our next step toward resolution of this case is to address Heritage's claim that interpreting the tariff in such a way that liability for acts of common negligence is excluded also gives rise to constitutional implications.

It is Evergy's position that this issue never arose as part of the parties' briefing exchange on the motion for summary judgment and Heritage likewise failed to address the matter at the hearing on the motion. According to Evergy, the issue was resolved by the district court on the only grounds that Heritage put forth—that the KCC did not have the statutory authority to abrogate the common-law cause of action of negligence in the tariff.

"Preservation is a question of law subject to plenary review." *State v. Campbell*, 308 Kan. 763, 770, 423 P.3d 539 (2018). The preservation rule dictates that if an issue was not raised before the district court it generally cannot be raised on appeal. *In re Adoption of Baby Girl G.*, 311 Kan. 798, 801, 466 P.3d 1207 (2020).

36

Our review of Heritage's response to the summary judgment motion reveals that it did argue that the Legislature never granted the KCC the right to abrogate common law with its tariffs. While we note the absence of the word "constitutional," we acknowledge its entire argument is grounded in the Legislature's ability, or inability, to delegate a measure of authority to the KCC which paves the way for an abrogation of a common-law remedy. Heritage briefly argued that to the extent that was the Legislature's intention, it failed to provide a substitute remedy for its removal of a cause of action for negligence. Although the district court only addressed this argument in passing, we find the point was sufficiently raised by Heritage and is properly before us for consideration.

Heritage has not successfully cleared all the procedural hurdles necessary to secure review, however. Their filings with our court do not contain a comprehensive analysis of any constitutional concern they might harbor. Rather, the issue received merely a passing mention and was never fully fleshed out or litigated. While Heritage employs constitutional verbiage in its brief before this panel, it fails to clarify precisely which right is at issue aside from a general reference to the "removal of an ordinary negligence cause of action." They likewise do not propose which particular statute should be subjected to constitutional scrutiny and put forth a corresponding analysis. For us to make assumptions in that regard would essentially be developing Heritage's constitutional claim on its behalf and well outside the bounds of our neutral role. A party's failure to support their argument with pertinent authority or to show why it is sound despite a lack of supporting authority or in the face of contrary authority is akin to failing to brief the issue. Therefore, an argument that is not supported with pertinent authority is deemed waived and abandoned. *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 645, 294 P.3d 287 (2013). Further, an argument raised incidentally in a brief and not argued therein is also deemed abandoned. *Manhattan Ice & Cold Storage v. City of Manhattan*, 294 Kan. 60, 71, 274 P.3d 609 (2012).

Heritage has failed to advance their constitutional claim in a manner that enables us to meaningfully review its particulars and, as a result, has effectively abandoned this argument on appeal. Consequently, the issue will not receive further consideration.

### E. Did the district court err in holding there were insufficient facts to submit the issue of willful or wanton conduct to a jury?

We previously noted that the district court granted Evergy's motion on two independent legal bases—that the utility was insulated from liability for ordinary negligence through operation of its tariff and that Heritage failed to demonstrate that the damage it suffered was the product of Evergy's wanton conduct. Both parties graced us with extensive analyses of each aspect of the district court's ruling in their written briefs as well as during oral argument to our court. Thus, even though we are reversing this matter for a trial to litigate Heritage's claim against Evergy for ordinary negligence, we nevertheless believe it is prudent to address and analyze each issue the parties so comprehensively presented to us for resolution.

Heritage argues that the district court erred in finding there were not sufficient facts to submit the issue of willful or wanton conduct to a jury. Specifically, it contends that Evergy was aware of the broad risk of dangerous conditions associated with aging utility poles, yet it failed to adhere to an inspection program that complied with industry standards. It elaborates that although Evergy may have undertaken some actions to incidentally lessen the risk of a catastrophic pole failure, none of those actions were designed to identify aging and decaying poles or avoid catastrophic pole failure. Finally, it asserts that reasonable minds could differ with respect to whether Evergy's inspection and preventative measures materially lessened the risk of catastrophic pole failure and, therefore, the district court erred in ruling as a matter of law that Evergy's conduct fell short of wanton.

38

Evergy responds that the tariff imposes a burden on Heritage to establish that such wanton conduct affirmatively appeared, which it failed to do before the district court. Additionally, Evergy argues that Heritage does not demonstrate the existence of a genuine issue of material fact. Finally, it asserts that there was insufficient evidence to support a finding of wanton conduct.

Returning briefly to our standard of review. When this case was before the district court, Evergy, as the party seeking summary judgment, had the burden to show that, based on the evidence, there were no material facts for either a jury or the judge sitting as fact-finder to decide that would have any bearing on the outcome of the case. *GFTLenexa*, 310 Kan. at 981-82. The district court found that Evergy successfully satisfied its burden and granted summary judgment. To uphold that decision on appeal, we must review the facts in the light most favorable to Heritage, as the party opposing summary judgment, and determine whether there truly are no issues of material fact. If that review leads us to conclude that reasonable minds could disagree about the conclusion to be drawn from the evidence, that will indicate a genuine issue does exist with respect to a material fact and require us to reverse the district court's grant of summary judgment to Evergy. See *Edwards v. Anderson Engineering, Inc.*, 284 Kan. 892, 904, 166 P.3d 1047 (2007).

In Kansas, wanton conduct "is distinct from negligence and differs in kind." *Bowman v. Doherty*, 235 Kan. 870, 876, 686 P.3d 112 (1984). The *Bowman* court elaborated that "[w]anton conduct is distinguished from a mere lack of due care by the fact that the actor realized the imminence of injury to others from his acts and refrained from taking steps to prevent the injury. This reckless disregard or complete indifference rises substantially beyond mere negligence." 235 Kan. at 876. Unlike negligence, "[w]anton conduct is established by the mental attitude of the wrongdoer rather than by the particular negligent acts." *Robison v. State*, 30 Kan. App. 2d 476, 479, 43 P.3d 821 (2002) (citing *Friesen v. Chicago, Rock Island & Pacific Rld.*, 215 Kan. 316, 322, 524

39

P.2d 1141 [1974]). Because wantonness derives from that mental attitude, acts of omissions as well as acts of commission can be wanton. *Gould v. Taco Bell*, 239 Kan. 564, 572, 722 P.2d 511 (1986).

To successfully establish wanton conduct, a plaintiff must make a two-pronged showing: (1) that the act was performed with a realization of the imminence of danger; and (2) that it was carried out with a reckless disregard of or complete indifference to the probable consequences of the act. *Reeves v. Carlson*, 266 Kan. 310, 314, 969 P.2d 252 (1998); *Gould*, 239 Kan. at 572. Stated another way, the keys to demonstrating wantonness are the knowledge of a dangerous condition and an indifference to its consequences. *Reeves*, 266 Kan. at 314. The plaintiff is not required to prove any degree of intent or willingness to injure on the part of the actor. *Lanning v. Anderson*, 22 Kan. App. 2d 474, 479, 921 P.2d 813 (1996) (citing *Boaldin v. University of Kansas*, 242 Kan. 288, 293, 747 P.2d 811 [1987]).

The first prong may be established in two ways. First, the plaintiff may put on direct evidence of the defendant's actual knowledge of a dangerous condition. Second, they may establish, through circumstantial evidence, a defendant's reason to believe that his act might result in injury to another because it was taken with express disregard of a high and excessive degree of danger, which was either known to the defendant or readily apparent to a reasonable person in the defendant's position. See 22 Kan. App. 2d at 481-82.

Turning to the second prong, the Kansas Supreme Court has explained that definite acts undertaken by a defendant which materially lessen the chances of the likely consequences can potentially insulate an actor from liability, but the acts must constitute more than mere token efforts. *Friesen*, 215 Kan. at 323. Critical to the analysis of such precautionary measures is whether they actually materially lessen the chances of the consequences associated with the particular "dangerous condition" analyzed under the

first prong of the test. *Wagner v. Live Nation Motor Sports, Inc.*, 586 F.3d 1237, 1244-45 (10th Cir. 2009).

Therefore, when assessing if wanton conduct is established, a reviewing court must carefully apply both prongs of the test to the same alleged risk. See *Reeves*, 266 Kan. at 314.

> "In other words, if the first part of Kansas's two-part inquiry asks whether the defendant had knowledge of a broadly described dangerous condition, the second part of that inquiry must ask whether the defendant recklessly disregarded or was indifferent to the same broadly described risk; conversely, if the first part of the test targets the narrow, specific risk that caused the particular accident at issue and asks if the defendant was aware or should have been aware of that particular specific risk, then the second part of the analysis to be consistent must ask if the defendant was indifferent to that specific risk." *Wagner*, 586 F.3d at 1245.

After conducting its analysis, the district court concluded that Heritage failed to "demonstrate awareness of any imminent risk by Evergy" and "[i]n the absence of any basis to believe that Evergy knew of or had reason to know the pole at issue had soundness issues, it is hard to make the argument that Evergy was even negligent with respect to the maintenance of this pole." That conclusion is fundamentally flawed. Heritage's position before the district court, as it is here, was that there is a broad risk associated with wooden utility poles generally because they age and can fail. But the district court's focus was on the Heritage pole in isolation. That runs in contravention of the test which requires that the same risk be contemplated under both steps of the test. See *Wagner*, 586 F.3d at 1245; *Reeves*, 266 Kan. at 314. Stated differently, it held Heritage to a standard it was not required to satisfy.

Viewing the risk broadly under the first prong, as Heritage advocates for, Evergy had knowledge of the broad risk that aging utility poles create. In *Cope v. Kansas Power*

41

*& Light Co.*, 192 Kan. 755, 761, 391 P.2d 107 (1964), the court found that utility companies have a duty to exercise the highest degree of care when maintaining electric power lines in order to protect the public and stated:

> "From the beginning, it has been the rule that a high-voltage line is one of the most dangerous things known to man; that not only is the current deadly, but the ordinary person has no means of knowing whether any particular wire is carrying a deadly current or is harmless, and that distributors of electricity which erect and maintain electric power lines are under a duty to exercise the highest degree of care to protect the public from danger." 192 Kan. at 761.

With respect to the first prong, Evergy, as a deliverer of electricity, had knowledge of the broadly described dangerous condition. Electricity is inherently dangerous, and when wooden poles subject to aging are the means relied upon to assist with the transport of that commodity, a risk to the general public is created. Evidence adduced at the hearing established that there is an industry standard which requires that poles be inspected every 10 years and that Evergy had knowledge of that standard. That is circumstantial evidence of the importance of maintaining the poles that Evergy relied upon to transport its electricity.

Under the second prong, Heritage has the burden to show that Evergy recklessly disregarded or was indifferent to the same broadly described risk—that improper maintenance of inherently dangerous electrical poles can lead to catastrophic failure and subsequent damages. See *Wagner*, 586 F.3d at 1245.

Evergy contends that it responsibly took steps to materially lessen any risk of pole failure by tracking and reporting work performed on the portions of the system most in need of immediate attention, conducting circuit walkdowns, as well as rolling targeted excavation and inspection of specific poles under a contractor-based program. It also highlighted its workplace policies which directed employees to repair and report any

42

safety issues, and that journeymen had the authority to immediately order pole replacement when the need arose. Evergy also cited its alleged compliance with the NESC code and the KCC's inspection program. While that final factor may be true, as Heritage points out, under Kansas law, compliance with a governing code does not automatically negate liability. In *Cerretti v. Flint Hills Rural Electric Co-op Ass'n*, 251 Kan. 347, 356-57, 837 P.2d 330 (1992), the Kansas Supreme Court held:

> "Conformity with the NESC or an industry-wide standard is not an absolute defense to negligence. While it may be evidence of due care, compliance with industry standards, or standards legislatively or administratively imposed, does not preclude a finding of negligence where a reasonable person engaged in the industry would have taken additional precautions under the circumstances. Whether the company is negligent, even though it complied with the code, is usually a question to be determined by the jury under proper instructions by the court."

Whether Evergy exercised all due care in its inspection program, given its awareness of the extreme risk inherent to providing electrical services, is a question on which reasonable minds could differ, and as such, it should be submitted to a jury.

The record contains some evidence that, when viewed in favor of Heritage, indicates Evergy was on notice that its inspection protocol did not meet the recommended 10-year inspection cycle. Specifically, Bingel, who, again, currently held the role of NESC chairman and served as the former Vice President of Product Strategy for Osmose Utilities, the company with whom Evergy contracted to conduct its inspections, provided testimony addressing those points. To be clear, this was not merely a matter where Evergy had knowledge of a dangerous condition. There is also evidence before us which bears out that Evergy limited its inspections to only those poles delivering electricity within circuits that were lesser performing and those in higher performing circuits, such as the one at issue here, were generally not scheduled for inspections. That is, it took affirmative steps to avoid performing inspections of and, by association, the

43

corresponding maintenance required for, a portion of its wooden poles. Viewing this evidence in the light most favorable to Heritage, reasonable minds could certainly differ on whether Evergy's preventative measures were sufficient to materially lessen the risk of catastrophic pole failure. Thus, the district court erred in ruling that Evergy's conduct was not wanton as a matter of law. This is a question that must be submitted to a jury. See *Cerretti*, 251 Kan. at 357 ("Whether the company is negligent, even though it complied with the code, is usually a question to be determined by the jury under proper instructions by the court.").

Evergy contends that the tariff provisions demand a higher standard from Heritage in that any allegations of wanton conduct must be "affirmatively shown." It notes that while the term is not expressly defined in the tariff, it "is regularly used to signify a heightened factual burden that does not rely merely on inferences, specification, argument or bare allegations." To refresh, the relevant language from subsection 7.02(B), the subsection which provided the foundation for the district court's ruling, states:

> "Customer shall save Company harmless from all claims for trespass, injury to persons and damage to lawns, trees, shrubs, buildings or other property that may be caused by reason of or related to Company's operations, the provision of Electric Service hereunder and the installation, maintenance or replacement of Company's service lines or other facilities necessary to serve customer, *unless it shall affirmatively appear that the injury to persons or damage to property complained of has been caused by Company's willful or wanton conduct*." (Emphasis added.)

However, Kansas law does not support the interpretation that Evergy implores us to assign this phrase. While reasonable limitations of simple negligence are permitted, the *Danisco* court expressly held that it is "not reasonable for the KCC to allow a tariff to become effective which would relieve [a utility] of liability for damages resulting from its wanton or willful misconduct." *Danisco*, 267 Kan. at 772. Evergy's proposed reading

44

contravenes this directive by raising the bar of the wanton standard to increase its chances it will be spared liability.

To preclude summary judgment, the facts subject to the dispute must be material to the conclusive issue in the case. When reasonable minds could differ as to the legal conclusions drawn from the evidence and the motion has been granted by the district court, it is incumbent upon this court to reverse the ruling granting summary judgment. We find a legitimate, material question exists whether Evergy's practices rise to the level of wanton disregard of the public's safety. A question of that nature is most appropriately resolved by a jury. Accordingly, the district court's decision granting summary judgment to Evergy was erroneous and must be reversed.

CONCLUSION

The use of the summary judgment procedure is to be encouraged as an aid in the expeditious disposition of a lawsuit. However, it is a drastic means of disposing of litigation and, therefore, should be allowed only when the right of the moving party is clear and free from doubt. That is not this case. Rather, in finding that 7.02(B) of Evergy's tariff structure insulated it from liability, the district court opted to enforce a provision that is unreasonable and inconsistent with both Kansas law and public policy. Additionally, a district court errs in entering an award for summary judgment when a very real question exists concerning the nature of a public utility's conduct. Rather, such matters are best resolved through submission to a jury.

Reversed and remanded.